Filed 11/2/15   (unmodified opn. attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUJUAN BELL ET AL.,<br><br>    Defendants and Appellants. | F064909<br><br>(Kern Super. Ct. Nos. BF123070A;<br>BF123070B; BF123070C &<br>BF123070D)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the following modifications be made to the published portion of the opinion filed herein on October 15, 2015:

1.  Add the word "fired" between the words "being" and "by" in the last line of page 14, such that the line reads as follows:

> 7.62-caliber ammunition capable of being fired by either an SKS
> rifle or AK 47; and pants

2.  Omit the "!" between the second and third sentences of the last paragraph on page 20.

There is no change in the judgment.

Appellant Bell's petition for rehearing filed on October 23, 2015, is denied.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
SMITH, J.

2.

Filed 10/15/15 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUJUAN ROBERT BELL et al.,<br><br>    Defendants and Appellants. | F064909<br><br>(Kern Super. Ct. Nos. BF123070A;<br>BF123070B; BF123070C &<br>BF123070D)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Charles R. Brehmer, Judge.

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant Jujuan Robert Bell.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant Deon Lavell Joseph.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Lynell Travon Lewis.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II-XIII of the Discussion.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant John Fitzgerald Williams.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

When construing a statute, our job is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted…." (Code Civ. Proc., § 1858.)  Adhering to these principles sometimes has us resolving issues contrary to our own views of policy and practicality. This case presents such an issue.

The Penal Code provides for the right to a jury trial on factual issues underlying a plea of once in jeopardy.  (Pen. Code, §§ 1041(3)–1042.)[1]  In this case, defendants entered pleas of once in jeopardy, based on their claim that the prosecutor at the first of their two trials intentionally goaded them into requesting a mistrial.  (See generally, *Oregon v. Kennedy* (1982) 456 U.S. 667 (*Kennedy*).)

The Attorney General contends sections 1041(3) and 1042 apply to some, but not all, pleas of once in jeopardy.  We conclude that interpretation is clearly foreclosed by the plain language of the statutes.

Several implications of this conclusion are regrettable.  Double jeopardy claims predicated on prosecutorial goading claims do not seem particularly well-suited for resolution by juries in several respects.  And the interplay between *Kennedy* and section 1042 will require already overburdened trial judges to manage a new type of trial that will likely raise unique evidentiary and instructional questions.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

But "our hands are tied" (*Oakes v. McCarthy Co.* (1968) 267 Cal.App.2d 231, 257), and we must adhere to " 'the plain meaning of the actual words of the law, " ' "whatever may be thought of [its] wisdom, expediency, or policy ...." ' " ' [Citation.]" (*People v. Loeun* (1997) 17 Cal.4th 1, 8–9.)[2]

It is important to emphasize the nature of the issue we decide today. We would not, on a blank slate, create the right to a jury trial on pleas raising *Kennedy*-type[3] claims. But that is not the question we face. Instead, the question we address is whether the Penal Code requires a jury trial on a once in jeopardy plea asserting a *Kennedy*-type claim. Both questions are important, but only one is ours to answer. (See Code Civ. Proc., § 1858.)

We conditionally reverse the judgment.[4]

---

[2] Nonetheless, we strongly urge the Legislature to address the implications of this result by weighing a criminal defendant's statutory right to a jury trial on double jeopardy defenses against burdens placed on juries and courts relative to time, efficiency, expense and proof. We would draw the Legislature's attention to the fact that evaluation of a prosecutor's intent would, in most cases, be more readily discerned by the trial judge who is familiar with trial practice and tactics. However, we recognize that " '[c]rafting statutes to conform with policy considerations is a job for the Legislature …. ' [Citation.]" (*California Ins. Guar. Assn. v. Workers' Comp. Appeals Bd.* (2004) 117 Cal.App.4th 350, 362.) Hence, we invite the Legislature to consider whether a defendant should have a statutory right to a jury trial on a plea of once in jeopardy that asserts a claim under *Kennedy* or its progeny.

[3] We use the term *Kennedy*-type claims to encompass double jeopardy claims that retrial is barred when a mistrial is declared at a defendant's request because the prosecutor allegedly engaged in certain conduct with a specific intent (e.g., to goad the defense into requesting a retrial or to thwart an acquittal). We acknowledge that cases before *Kennedy* recognized such claims. (E.g., *United States v. Dinitz* (1976) 424 U.S. 600, 611.) Also, cases after *Kennedy* have recognized similar but distinct double jeopardy claims that also fit this criteria. (E.g., *People v. Batts* (2003) 30 Cal.4th 660, 695 (*Batts*).) We use the phrase "*Kennedy*-type claims" as a shorthand way to refer to these theories of double jeopardy.

[4] In the unpublished portion of this opinion, we resolve several other issues raised by defendants and the Attorney General.

**STATEMENT OF THE CASE**

1. Convictions

Defendants Lynell Travon Lewis (Lewis), Deon Lavell Joseph (Joseph), Jujuan Robert Bell (Bell), and John Fitzgerald Williams (Williams) were each convicted of four counts of second-degree robbery (counts 1–4; § 212.5, subd. (c)), six counts of assault with a semiautomatic firearm (counts 5–7, 9–11; § 245, subd. (b)), five counts of assault with an assault weapon (counts 12–14, 16–17; § 245, subd. (a)(3)),[5] two counts of transporting an assault weapon (counts 19, 24; former § 12280, subd. (a)(1); see § 30600), two counts of participating in a criminal street gang (counts 21, 28; § 186.22, subd. (a)), one count of conspiracy to commit assault with a semiautomatic firearm (count 22; § 182, subd. (a)(1)), one count of conspiracy to commit robbery (count 23; § 182, subd. (a)(1)), and one count of carrying a loaded firearm in public by a member of a criminal street gang (count 26; § 12031, subd. (a)(2)(C)). Defendants Bell and Lewis were additionally convicted of two counts of possessing a firearm as a felon (counts 18 & 27; § 12021, subd. (a)(1)).[6]

2. Enhancements

The jury found that all of these crimes were committed for the benefit of, or in association with, a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subd. (b)) as alleged in the

---

[5] Several of the victims of the assault with a semiautomatic firearm and assault with an assault weapon convictions were the same. The victim of counts 5 and 13 was Deion Chester; the victim of counts 6 and 17 was David Valle; the victim of counts 9 and 14 was Becky Tam; the victim of counts 10 and 16 was David Ahrens. Others were only directly alleged to be the victim of one crime: the victim of count 7 was Melissa Gomez; the victim of count 11 was Raed Fahel, and the victim of count 12 was Marshall Golden.

[6] The court granted a motion for acquittal (§ 1118.1) on counts 8 and 15, which alleged assaults on Robert Goldfisher. A charge of vehicle theft (count 20) was dismissed pursuant to a stipulation between counsel. Another charge of vehicle theft (count 25) was dismissed on the court's motion.

indictment, except the active gang participation counts (counts 21 & 28) and the single count of possessing a loaded firearm by an active street gang member (count 26).

The jury also found that, as to the robbery counts, each defendant was a principal and at least one principal personally used a firearm as alleged in the indictment.[7] (§ 12022.53, subd. (e)(1).) The jury further found that a principal was armed during the commission of the two conspiracy counts. (§ 12022, subd. (a).)

The jury found that Joseph, Lewis and Williams each personally used a firearm during the commission of the six counts of assault with a semiautomatic firearm and the two counts of active participation in a criminal street gang. (§ 12022.5, subd. (a).) The jury found it "not true" that Bell personally used a firearm during the commission of those crimes.

The trial court found that the prior convictions alleged against Bell and Lewis were true.

### 3. Sentences

The court sentenced Bell to prison for 79 years 4 months; Lewis for 71 years; Williams for 64 years; and Joseph for 55 years 4 months.[8]

---

[7] With one exception: no verdict form for this enhancement to count 28 (active gang participation) as to Bell was submitted to the jury.

[8] Bell's <u>sentence</u> was comprised of the following: The court imposed a base term of 12 years for assault with an assault weapon (count 12), doubled to 24 years due to the strike prior (§ 667, subd. (e)), plus five years for the gang enhancement (§ 186.22, subd. (b)(1)(B)), plus five years for the prior serious felony enhancement (§ 667, subd. (a).) The court imposed the following sentences for the robbery convictions (counts 1–4): four consecutive two-year terms plus four terms of three years four months for the firearm enhancements (§ 12022.53, subds. (b) & (e)(1)), plus four stayed 10-year terms for the gang enhancement (§ 186.22, subd. (b)(1)(B), Cal. Rules of Court, rule 4.447 (rule 4.447).) On counts 5, 9 and 10 (assault with a semiautomatic firearm – § 245, subd. (b)), the court imposed, then stayed (§ 654): three 9-year terms, each doubled to 18 years for the prior strike (§ 667, subd. (e)), plus three 5-year terms for the gang enhancement. The abstract of judgment incorrectly indicates that the court sentenced defendant under subdivision (b)(1)(C) of section 186.22, rather than subdivision (b)(1)(B). The abstract also fails to indicate the gang enhancement was

imposed on count 10. (§ 186.22, subd. (b)(1)(B). On counts 7 and 11 (assault with a semiautomatic firearm – § 245, subd. (b)), the court imposed two consecutive four-year terms, plus two consecutive one-year eight-month terms for the gang enhancements. The abstract of judgment incorrectly identifies subdivision (b)(1)(C) of section 186.22 as the applicable provision rather than subdivision (b)(1)(B). On count 13 (assault with assault weapon – § 245, subd. (a)(3)), the court imposed a consecutive five-year four-month term, plus one year eight months for the gang enhancement (§ 186.22, subd. (b)(1)(B).) On counts 14, 16, and 17, the court imposed three concurrent 12-year terms, doubled to 24 years for the prior strike (§ 667, subd. (e)), plus three concurrent five-year terms for the gang enhancement (§ 186.22, subd. (b)(1)(B).) On count 18 (possession of a firearm by a felon – § 12021, subd. (a)(1)), the court sentenced Bell to a stayed (§ 654) term of six years, plus a stayed term of four years for the gang enhancement (§ 186.22, subd. (b)(1).) On count 19 (transportation of an assault weapon – former § 12280, subd. (a)(1)), the court sentenced Bell to a stayed (§ 654) term of eight years, doubled to 16 years due to the prior strike (§ 667, subd. (e).) On count 21 (participation in a street gang – § 186.22, subd. (a)), the court sentenced Bell to a stayed (§ 654) term of three years, doubled to six years due to the prior strike (§ 667, subd. (e).) On count 22 (conspiracy to commit assault with a semiautomatic firearm – § 182, subd. (a)(1)), the court sentenced Bell to a consecutive term of four years, plus one year eight months for the gang enhancement (§ 186.22, subd. (b)(1)(B)), plus a stayed term of one year for the firearm enhancement (§ 12022, subd. (a)(1).) On count 23 (conspiracy to commit robbery – § 182, subd. (a)(1)), the court sentenced Bell to a stayed (§ 654) term of five years, doubled to 10 years due to the prior strike (§ 667, subd. (e)), plus a stayed term of 10 years for the gang enhancement, and one year for the firearm enhancement (§ 12022, subd. (a)(1).) On count 24 (transporting an assault weapon – former § 12280, subd. (a)(1)), the court sentenced Bell to a concurrent term of eight years, doubled to 16 years due to the prior strike (§ 667, subd. (e)), plus a concurrent term of four years for the gang enhancement (§ 186.22, subd. (b)(1)), stayed pursuant to section 654. On counts 26 (§ 12031, subd. (a)(2)(C)), 27 (§ 12021, subd. (a)(1)) and 28 (§ 186.22, subd. (a)), the court sentenced Bell to three stayed (§ 654) terms of three years, doubled to six years for the prior strike (§ 667, subd. (e).)

Lewis's sentence was comprised of the following: The court imposed a base term of nine years on count 11 (assault with a semiautomatic firearm – § 245, subd. (b)), doubled to 18 years for the prior strike (§ 667, subd. (e)), plus 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), plus 10 years for the firearm enhancement (§ 12022.5, subd. (a)), plus five years for the prior serious felony (§ 667, subd. (a)), plus one year for a prior prison term (§ 667.5, subd. (b).) The court imposed four consecutive two-year terms on the robbery convictions (counts 1–4), plus four terms of three years four months for the firearm enhancements (§ 12022.53, subds. (b) & (e)(1)), plus four stayed (rule 4.447) 10-year terms for the gang enhancements. On the assault with a semiautomatic weapon charge (counts 5–7, 9, 10), the court sentenced Lewis to five

6.

concurrent terms of nine years, doubled to 18 years due to the prior strike (§ 667, subd. (e)), plus five concurrent terms of 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), plus five concurrent terms of 10 years for the firearm enhancement. (§ 12022.5, subd. (a).)  On count 12, the court sentenced Lewis to a concurrent term of 12 years, doubled to 24 years for the prior strike (§ 667, subd. (e)), plus a concurrent five-year term for the gang enhancement.  On counts 13–14 and 16–17 (assault with an assault weapon counts – § 245, subd. (a)(3)), the court sentenced Lewis to a stayed (§ 654) term of 12 years, doubled due to 24 years for the prior strike (§ 667, subd. (e)), plus a stayed (§ 654) five-year term on the gang enhancement (§ 186.22, subd. (b)(1)(B).)  On count 18 (possession of a firearm by a felon – § 12021, subd. (a)(1)), the court sentenced Lewis to a stayed (§ 654) term of six years, plus a stayed (§ 654) term of four years for the gang enhancement (§ 186.22, subd. (b)(1).)  On count 19 (transportation of an assault weapon – former § 12280, subd. (a)(1)), the court sentenced Lewis to a stayed (§ 654) term of eight years, doubled to 16 years due to the prior strike (*ibid.*), plus a stayed (*ibid.*) term of 4 years for the gang enhancement (§ 186.22, subd. (b)(1).)  On count 21 (participation in a street gang – § 186.22, subd. (a)), the court sentenced Lewis to a stayed (§ 654) term of three years, doubled to six years due to the prior strike (§ 667, subd. (e)).  On count 22 (conspiracy to commit assault with a semiautomatic firearm – § 182, subd. (a)(1)), the court sentenced Lewis to a consecutive term of four years, plus one year eight months for the gang enhancement (§ 186.22, subd. (b)), plus a stayed (§ 654) one-year term on the firearm enhancement (§ 12022, subd. (a)(1).)  On count 23 (conspiracy to commit robbery – § 182, subd. (a)(1)), the court sentenced Lewis to a stayed (§ 654) term of five years, doubled to 10 years due to the prior strike (§ 667, subd. (e)), plus a stayed (§ 654) 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)(B)), plus a stayed (§ 654) 1-year term on the firearm enhancement (§ 12022, subd. (a)(1).)  On count 24 (transportation of an assault weapon – former § 12280, subd. (a)(1)), the court sentenced Lewis to a stayed (§ 654) term of eight years, doubled to 16 years due to the prior strike (§ 667, subd. (e)), plus a stayed (§ 654) four-year term on the gang enhancement (§ 186.22, subd. (b)(1).)  On count 26 (carrying a loaded firearm in public as a street gang member – 12031, subd. (a)(2)(C)), the court sentenced Lewis to a stayed (§ 654) term of three years, doubled to six years due to the prior strike (§ 667, subd. (e).)  On count 27, the second possession of a firearm by a felon (§ 12021, subd. (a)(1), the court sentenced Lewis to a stayed (§ 654) term of three years, doubled to six years due to the prior strike (§ 667, subd. (e).)  On count 28 (participation in a street gang – § 186.22, subd. (a)), the court sentenced Lewis to a stayed (§ 654) term of three years, doubled to six years due to the prior strike (§ 667, subd. (e)), plus a stayed (§ 654) term of 10 years on the firearm enhancement.  (§ 12022.5, subd. (a).)

Williams's sentence was comprised of the following:  The court imposed a base term of nine years on count 11 (assault with a semiautomatic firearm – § 245, subd. (b)), plus 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), plus 10 years for the personal firearm use enhancement (§ 12022.5, subd. (a).)  For the robbery convictions

7.

(counts 1–4 – § 212.5, subd. (c)), the court imposed four consecutive one-year terms, plus four 3-year four-month terms for the firearm enhancements (§ 12022.53, subds. (b) & (e)(1)), plus four stayed (rule 4.447) 10-year terms for the gang enhancement (§ 186.22, subd. (b)(1)(C).)  On count 5 (assault with a semiautomatic weapon – § 245, subd. (b)), the court sentenced Williams to a consecutive term of two years, plus three years four months for the firearm enhancement (§ 12022.53, subds. (b) & (e)(1)), plus three years four months for the gang enhancement.  On counts 6, 7, 9, and 10 (assault with a semiautomatic firearm – § 245, subd. (b)), the court imposed four concurrent nine-year terms, plus four concurrent 10-year terms for the gang enhancement (§ 186.22, subd. (b)(1)(C)), plus four concurrent 10-year terms on the firearm enhancement (§ 12022.5, subd. (a)).  It should be noted that in the oral pronouncement of judgment on count 6, the court said Williams was sentenced to "the upper term of two years."  The minute order and abstract of judgment, however, reflect that Williams's sentence on count 6 was actually nine years.  The correct upper term sentence on count 6 was nine years.  (§ 245, subd. (b).)  Williams does not raise any appellate issue with respect to this discrepancy.  On count 12 (assault with an assault weapon – § 245, subd. (a)(3)), the court sentenced Williams to a consecutive term of two years eight months, plus one year eight months on the gang enhancement (§ 186.22, subd. (b)(1)(B).)  On counts 13, 14, and 17 (assault with an assault weapon – § 245, subd. (a)(3)), the court sentenced Williams to three 12-year terms stayed pursuant to section 654, plus five years for the gang enhancement, also stayed pursuant to section 654.  The Attorney General indicates the court failed to impose the gang enhancement on counts 13, 14 and 17.  But the court did impose, then stayed the gang enhancement.  However, the enhancements were improperly omitted from the abstract of judgment.  On count 16 (assault with an assault weapon – § 245, subd. (a)(3)), the court sentenced Williams to a stayed (§ 654) term of 12 years, plus a stayed (*ibid.*) five-year term for the gang enhancement (§ 186.22, subd. (b)(1)(B)).  On count 19 (transporting an assault weapon – former § 12280, subd. (a)(1)), the court sentenced Williams to a stayed (§ 654) term of eight years, plus a stayed term of four years for the gang enhancement (§ 186.22, subd. (b)(1).)  On count 21 (participation in a street gang – § 186.22, subd. (a)), the court sentenced Williams to a stayed (§ 654) term of three years, plus a stayed (*ibid.*) term of 10 years for the firearm enhancement.  (§ 12022.5, subd. (a).)  The abstract of judgment improperly omitted the firearm enhancement sentence.  On count 22 (conspiracy to commit assault with a semiautomatic firearm – § 182, subd. (a)(1)), the court sentenced Williams to a stayed (§ 654) term of nine years, plus a stayed (*ibid.*) term of five years for the gang enhancement (§ 186.22, subd. (b)(1)(B)), plus a stayed (§ 654) term of one year on the firearm enhancement (§ 12022, subd. (a)(1)).  On count 23 (conspiracy to commit robbery – § 182, subd. (a)(1)), the court sentenced Williams to a consecutive term of one year, plus a term of three years four months on the gang enhancement (§ 186.22, subd. (b)(1)(B)), plus four months on the firearm enhancement (§ 12022, subd. (a)(1)).  On count 24 (transporting an assault weapon – former § 12280, subd. (a)(1)), the court sentenced Williams to a stayed (§ 654) term of eight years, plus a stayed (*ibid.*) term of

8.

four years on the gang enhancement (§ 186.22, subd. (b)(1)). On count 26 (gang member carrying a loaded firearm in public – § 12031, subd. (a)(2)(C)), the court sentenced Williams to a stayed (§ 654) term of three years. On count 28, (participation in a street gang – § 186.22, subd. (a)), the court sentenced Williams to a stayed (§ 654) term of three years, plus a stayed term of 10 years for the firearm enhancement (§ 12022, subd. (a)(1).) Williams's abstract of judgment omits the firearm enhancement on count 28.

Joseph's sentence was comprised of the following: The court imposed a base term of nine years on count 11 (assault with a semiautomatic weapon – § 245, subd. (b)), plus 10 years for the gang enhancement (§ 186.22, subd.(b)(1)(C)), plus 10 years for the personal firearm use enhancement (§ 12022.5, subd. (a)). On the robbery convictions (counts 1–4 – § 212, subd. (c)), the court imposed four consecutive one-year terms, plus four terms of three years four months on the firearm enhancements (§ 12022.53, subd. (b) & (e)(1)), plus four stayed (rule 4.447) 10-year terms for the gang enhancements (§ 186.22, subd. (b)(1)(C).) On the remaining counts of assault with a semiautomatic weapon (counts 5–7, 9, 10 – § 245, subd. (b)), the court imposed five concurrent nine-year terms, plus five concurrent terms of 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), plus five concurrent terms of 10 years for the firearm enhancements (§ 12022.5, subd. (a).) On count 12, (assault with an assault weapon – § 245, subd. (a)(3)), the court sentenced Joseph to a consecutive term of two years eight months, plus one year eight months for the gang enhancement (§ 186.22, subd. (b)(1)(B).) On counts 13, 14, 16 and 17 (assault with an assault weapon – § 245, subd. (a)(3)), the court sentenced Joseph to 12 years, stayed pursuant to section 654, plus five years for the gang enhancement (§ 186.22, subd. (b)(1)(B)), also stayed pursuant to section 654. On counts 19 and 24 (transportation of an assault weapon – former § 12280, subd. (b)(1)(B)), the court sentenced Joseph to two stayed (§ 654) eight-year terms, plus two stayed (*ibid.*) four-year terms for the gang enhancement (§ 186.22, subd. (b)(1).) On counts 21 and 28 (participation in a street gang – § 186.22, subd. (a)), the court sentenced Joseph to two stayed (§ 654) terms of three years each, plus two 10-year terms for the firearm enhancements. The abstract of judgment omits the 10-year terms for the firearm enhancements on counts 21 and 28. On count 22 (conspiracy to commit assault with a semiautomatic firearm – § 182, subd. (a)(1)), the court sentenced Joseph to a stayed (§ 654) term of nine years, plus a stayed (*ibid.*) term of five years for the gang enhancement (§ 186.22, subd. (b)(1)(B)), plus a stayed (§ 654) term of one year on the firearm enhancement (§ 12022, subd. (a)(1).) On count 23 (conspiracy to commit robbery – § 182, subd. (a)(1)), the court sentenced Joseph to a consecutive term of one year, plus three years four months for the gang enhancement (§ 186.22, subd. (b)(1)(B)), plus four months for the firearm enhancement (§ 12022, subd. (a)(1)). On count 26 (carrying a loaded firearm in public as a gang member – § 12031, subd. (a)(2)(C)), the court sentenced Joseph to a stayed (§ 654) term of three years.

9.

**FACTS**

I.    2007 Crimes

In 2007 and 2008, defendants were each members of the Mona Park Compton Crips criminal street gang. Bell was an "O.G." in the gang, which meant he was "higher-ranking" and "deserving of respect within the gang from his fellow gang members." Lewis and Joseph each had tattoos demonstrating respect for Bell. Joseph also had a tattoo demonstrating respect for Lewis.

*A.  Hours Preceding Robbery of Golden West Casino*

Bell had two children with Tameka Turner (Turner), his girlfriend of eight years.[9] Turner testified under a grant of immunity, and this fact was made known to the jury.

In September 2007, Turner lived in Palmdale, California, while Bell was living in Compton, California. On September 12, 2007, Bell told Turner over the phone that he had "something to do" and would be coming to Palmdale.

When Turner came home from work late that night, defendant Bell was at her home with three other men. In a pretrial interview admitted into evidence, Turner identified two of the men as Joseph and Lewis.[10] She was not sure if defendant Williams (a.k.a. "Doonie") was the third man. Outside her home was a red Pontiac Grand Am "or something like that."

Turner went to sleep at around 2:00 or 2:30 a.m. the next morning.

*B.  The Robbery*

At approximately 4:00 a.m. on September 13, 2007, David Ahrens was standing outside of the Golden West Casino in Bakersfield, California, when he noticed a nearby

---

[9] Turner believed she was validly married to Bell. In grand jury testimony not admitted into evidence at trial, Turner said she later learned that her "marriage" to Bell was not legally valid.

[10] Turner referred to Joseph by his first name and Lewis by his gang moniker, "Travon." At trial, however, Turner claimed she did not know who the three men were.

car traveling the wrong way. The red, four-door car pulled up near Ahrens, and several men exited carrying firearms. The men pointed their weapons at Ahrens and said, "Get up against the F'ing wall and shut up." The men led Ahrens into the casino, pushing him in the back with the barrel of an assault rifle. The men told Ahrens to lay down.

Four assailants eventually entered the casino, each wearing a face covering.[11] One of the assailants wore dark clothing that covered his entire body and carried a type of firearm called an "SKS" rifle. The People contend this assailant was defendant Joseph.[12] Another assailant, alleged to be defendant Lewis, wore a white face covering, and carried an "AK-47-type" weapon with a missing butt stock. A third assailant, alleged to be defendant Williams, wore dark clothing and carried a silver handgun. The last assailant, alleged to be defendant Bell, carried a bag.

Security Guard Darren Forthman (Forthman) was standing near the door where the defendants entered. Immediately after the defendants entered the casino, Forthman dropped to his knees and put his hands behind his head. One of the card dealers at a nearby table, David Valle (Valle), also put his head down and hands up when the assailants entered.

Chris Akin was seated at the same table as Valle. Akin had a personal cell phone and a corporate cell phone placed on a nearby table. Akin was eventually ordered to get on the floor. When Akin eventually arose, he noticed both cell phones were gone.

Melissa Gomez, a Golden West Casino employee, was standing near Forthman when defendants entered. Gomez testified that the men had "big" guns and pointed them

---

[11] In the casino's surveillance video, the coverings appear to be shirts wrapped around each assailants' face.

[12] At trial, the defendants did not concede identity and challenged certain evidence used to establish identity. However, on appeal they do not contend there was insufficient evidence to establish their identity as the assailants. Since we set forth facts "in the light most favorable to the verdicts" (*People v. Givan* (2015) 233 Cal.App.4th 335, 340), we will refer to each assailant by the name of the defendant they were alleged to be.

in her direction, though not directly at her. They told her to get on the floor, so she went behind a wall, got on the floor and covered her face. She was scared.

Lewis stayed near the door where he had entered the casino. Bell entered the casino shortly after the other three assailants and was escorting Ahrens and a man named Robert Goldfisher. On the surveillance video, Lewis appears to point his firearm towards Valle on several occasions, and at Goldfisher at least once.

While Lewis stayed in the first area of the casino, Joseph and Williams proceeded farther, into a second card room. As Joseph entered the second card room, a man who had been sitting at a table began to run away. Joseph chased him and led him back at gunpoint.

Shortly after Joseph entered the second card room, security officer Deion Chester (Chester) got under a nearby table. Chester saw the assailants come in with guns "like AK-47s like you see on TV."

As Chester was ducking under the table, a woman named Becky Tam tried to leave the area. As she rounded a corner, she almost ran into Williams. Williams pointed his handgun towards Tam, and she got down onto the floor.[13]

A voice is heard on the surveillance video saying, "Gotti, come on Gotti." "Gotti" is Bell's gang moniker.

---

[13] Another victim, named Raed Fahel (Fahel), also testified. It is unclear where his observations fit into the chronology outlined above. Fahel was a patron at the casino when the robbery occurred. He heard people screaming and saying there was a robbery in progress. Fahel became scared, went under a table and tried to call 911. The casino became quiet, so Fahel terminated the call when the 911 operator answered. One of the men yelled, "No cell phones. Nobody talk. Nobody move."

Fahel's testimony regarding whether defendants were carrying firearms was confusing. At first, Fahel testified that he did not see any "guns." Then, he said that he did not remember whether he saw any guns. Later, when asked how he knew a robbery was occurring, he testified that he remembered "they had a gun – or they had a – like a rifle-type [*sic*] in their hand…." He also testified that he saw one of the men waiving a rifle left and right.

Bell then entered the second card room area and jumped over a nearby counter into the casino's cash cage. Casino employee Belinda Soto was crouched down on the other side of the counter. After climbing through the counter window, Bell told Soto to "open the safe." Soto told him that "security has the keys" to the safe and that security was "out front." Bell told Soto to "go get" the security guard. Soto began to walk away, presumably to get the security guard. Bell then proceeded to take money from the cash registers. Williams, apparently unaware of Bell's instruction to Soto, approached the cash cage window and said, "[W]hat is she doing?" Williams ran towards Soto and is heard saying, "lay [*sic*] down." Williams and Bell then escorted the security guard, Forthman, into the cash cage. Forthman is heard telling the men that he did not have the code to the safe.

The defendants eventually left the casino.

*C. Post-robbery*

1. Turner's House After the Robbery

At "maybe" 4:00, 5:00 or 6:00 a.m., on September 13, 2007, Turner was awakened at her home by several male voices, including Bell's. Turner also "thought" she heard Joseph's voice. She heard "somebody" laughing and "saying something about [how] they had to chase somebody or something like that."

Bell came into Turner's room while counting money. After a few hours, Bell left the house but not before giving Turner $2,500 and telling her to dispose of a bag on the living room floor. Turner did not move the bag for two days, after which she moved it into the garage. She did not touch the items inside the bag until October 31, 2007.

2. Recovery of the Red Pontiac

Near the casino, law enforcement located a red, four-door Pontiac. The vehicle engine was still hot, its passenger door was open, and there was a $100 bill on the road underneath the open door. The rear view mirror had a fingerprint that completely

matched Williams's fingerprint. The vehicle had been stolen in Southgate, California, on September 2, 2007.[14]

### 3. Interactions Between Lewis, Turner and Bell

Lewis and Turner slept together at her home "a few weeks approximately after September 13th."[15] After Lewis removed his clothing, Turner placed some of the clothing items in a hamper. Turner gave Lewis new clothes that "could have been" Bell's.

Prior to October 31, 2007, "maybe some time early in October," Turner was frustrated that Bell had been cheating on her. In anger, Turner vandalized a car Bell was driving by pouring sugar in the engine block. Turner claimed she also took clothes out of that same vehicle and put them into the closet where the bag Bell had given her was being stored. In total, she took four or five shirts and a jacket from the car.

### 4. Turner Empties the Contents of the Bag Bell had Given Her Immediately After the Robbery

On October 31, 2007, Turner took the bag Bell had given her out of the garage and dumped its contents on the floor. Inside the bag Turner found "money wrappers," plastic bottle containers, another bag containing a magazine for a firearm, and "some shirts." Turner contacted law enforcement, and several deputies responded to her home and took custody of the bag. A responding deputy observed a pile of items on the floor with half of the items in the bag, and the other half of the items in a pile on the ground near the bag. Among the items were the following: several money bags identical to those used by Golden West Casino; cash wrappers dated "9/12/07" that had been ripped; Akin's stolen corporate cell phone; several items of clothing, including a black shirt tied into a knot; 7.62-caliber ammunition capable of being by either an SKS rifle or AK 47; and pants

---

[14] This information was presented to the jury by way of a stipulation read by the trial court.

[15] This quotation is from counsel's question to which Turner replied affirmatively.

14.

with black Nike gloves in the back pocket. One of the cash wrappers had a fingerprint that matched Bell's right middle finger. A deputy sheriff transported the items in the trunk of his car to the technical investigations division.

Law enforcement also took custody of an SKS rifle with a foldable bayonet found in Turner's garage closet. The gun had not been in the home before Bell had arrived, and Turner believed Bell had placed the gun there.

The prosecution offered contested evidence that various DNA samples taken from the contents of the bag in Turner's home matched the defendants. This evidence included the following: A single-source DNA profile was obtained from a short-sleeved black shirt that matched Williams. A single-source DNA profile was obtained from a long-sleeved black shirt that matched Bell. Another long-sleeved black shirt had a mixture of DNA, with the major contributor matching Joseph. A white shirt had a mixture of DNA, with the major contributor matching Lewis.

The defense offered the testimony of a DNA consultant, which indicated that the deputy sheriff should have packaged items of evidence separately to prevent cross-contamination, and that it was possible for DNA to be transferred by touch.

II.    2008 Crimes

   A. *Facts Surrounding Alleged Conspiracy to Rob Golden West Casino in March 2008*

On March 27, 2008, Bell was at Turner's home, along with defendant Williams and a man named Michael Johnson. Bell told Turner he "needed another vehicle" because he "had something to do." Turner arranged for an acquaintance to give her a vehicle and report it stolen. Turner went with Williams to retrieve the car, then brought the vehicle back to her house. As she returned home, Turner saw Joseph and Lewis pulling up in another car.

Bell called a woman named Aleshia Grayson (Grayson) and told her to meet him in Bakersfield.[16]  On March 29, 2008, Grayson drove to Bakersfield with a woman named Chan Mitchell, and rented two motel rooms at a Day's Inn.[17]  That night, Grayson, Mitchell, Bell, Williams and Michael Johnson visited the Golden West Casino, but did not stay long.

The next day, March 30, 2008, Mitchell told Grayson that she had heard Bell and Williams talking about "something" that was "supposed to be going down out there."[18]  Mitchell believed the men planned to commit a robbery.  Grayson spoke to Bell about his plans.  Bell told Grayson that "they were gonna be robbing something that night."[19]  Bell told Grayson that the robbery would happen at 2:00 a.m. and that "everybody has to go to one table."  Grayson told Bell, "[T]hat is so crazy."  Bell was confident and told Grayson "he ha[d] done it before."[20]

### B.  Phone Calls Placed on March 30, 2008

On the afternoon of March 30, 2008, Bell and Lewis spoke on the phone.  Several slang words and phrases were used during the call and Kern County Sheriff's Deputy Lauro Cantu offered his opinion as to what those terms meant.

---

[16] At some point, Bell and Grayson were romantically involved.  It is not clear from Grayson's testimony exactly when the relationship began.  However, Grayson testified that the romantic relationship had ended by the time she testified in the second trial.

[17] At some point, Mitchell was romantically involved with defendant Williams.

[18] The sheriff's department obtained a wiretap on Bell's and Williams's cell phones.  The tap on Williams's phone became active on March 30, 2008, and the first pertinent call on Bell's cell phone was made the same day.

[19] At trial, Grayson said she lied when she told police Bell said he was planning a robbery.  After defendants' arrest, Grayson stayed in contact with Bell and Williams.  Grayson spoke with Bell and Williams a few days before testifying at trial.  Williams told Grayson, "[D]on't say nothin' " to the prosecutor.

[20] Bell did not say he had robbed the same casino before.

16.

Lewis asked Williams whether he had "scope[d] the scope" which, according to Deputy Cantu, meant to conduct surveillance. Williams responded affirmatively.

Lewis then asked whether Williams had their "whistles" which, according to Deputy Cantu, meant "guns." Williams responded affirmatively and then the following exchange took place:

"Lewis: You got that one?

"Williams: Huh?

"Lewis: You got that one?

"Williams: Ah, three.

"Lewis: I say you got that one? That one I …

"Williams: Yeah.

"Lewis: And then that one, huh, like uh Uzi shit that one time.

"Williams: That and uh some other shit."

Lewis told Williams, "Don't make a move without me, I'll be there."

Later on the call, Lewis told Bell: "[G]ive me a low I'm on my way." Deputy Cantu testified that "give me a low" meant to acquire an inconspicuous vehicle.

Lewis also said he had his "own tools" and asked if Bell wanted him to bring "2, 3, 4, or 5, 6, 7." Bell responded, "Nah, n**ga. Uno." Deputy Cantu testified that "tools" commonly refers to firearms and that the numbers meant that Bell was asking if he should bring up to seven firearms.

On a separate call later that evening, Williams asked Lewis if he was "bringing a whistle?" Lewis responded, "Hell yeah, what you think I'm gonna do and shit? Just come empty handed?" Later on the same call, Lewis asked Williams, "[H]ow far is it from here?" After confirming Lewis's question, Williams said, "The one. The same one." Lewis then said, "We've got a[ ]while man."

17.

At 8:20 p.m., Bell called Grayson. They discussed whether Bell should take a nap and for how long. The following discussion ensued:

"Grayson:    You can sleep longer than that.

"BELL:      Yeah. N\*\*ga uh, we got butterflies, n\*\*ga ain't.

"Grayson:    (laughter) I do too.

"BELL:      For what?

"Grayson:    I'm like, I am not gonna be able to go … cuz, what do you mean for what? Worried about you.

"BELL:      Play another song then silly. All Color Purple.

"Grayson:    Uh, my stomach gonna be turning, am gonna be in knots by the time two o'clock comes."

### C. Law Enforcement's Surveillance Activities on March 30–31, 2008

About two hours later, still on March 30, 2008, law enforcement began visual surveillance of Turner's residence. A Sergeant Downey took over surveillance duties at around 10:40 p.m. He observed Turner's residence from about four to six houses down.

Sergeant Downey observed a dark-colored Camry back into Turner's garage. At around 11:15 or 11:20 p.m., three to five males exited Turner's house and drove away in a PT Cruiser. A Lieutenant Kirkland followed the PT Cruiser to a Walmart. Inside the Walmart, Kirkland observed four males from the PT Cruiser purchase multiple items, including black gloves. Kirkland recognized one of the men as defendant Bell. The men then drove back to Turner's residence in the PT Cruiser.

Later, Sergeant Downey observed a "hatchback" vehicle[21] back into the driveway at Turner's residence. Over the course of the next 20 minutes, three to five males went to and from the back of the hatchback. It appeared to Sergeant Downey that the men were "either taking items from the garage and putting them in the hatchback or taking items

---

[21] A Lieutenant Michael Kirkland identified this vehicle as a white Pacifica.

18.

from the hatchback and putting them in the garage." Around midnight, the hatchback (i.e., the white Pacifica) and the dark-colored Camry left together.

### D. *Law Enforcement's Stop of Defendants' Vehicle*

Law enforcement stopped the Camry and a Pacifica on Highway 58 near Towerline Road.[22] Williams and Michael Johnson were removed from the Camry. Johnson had a Days Inn motel key in his back pocket.

Bell, Lewis and Joseph had been removed from the Pacifica. Several firearms were recovered from the Pacifica, including two shotguns, a silver nine-millimeter semiautomatic pistol, and an AK-47. The wooden butt of the AK-47 was missing, like the AK-47 used in the 2007 casino robbery. Various items of clothing were also recovered.

### E. *Williams's Interview with Law Enforcement*

Detectives interviewed Williams, and he denied knowing of any crime other than the stolen car in which he was stopped.

While in a patrol car on the way to jail, Williams was read the charges against him. Williams paused for two to five minutes, and then said, "When do you think they'll offer us a deal? Will it be our first court appearance or second or what?"

Later, when a booking clerk read the charges, Williams made a comment. Williams said, "Kidnapping. It was only an attempted robbery."

---

[22] The Attorney General requests that we take judicial notice "of the facts that Bakersfield is located northwest of Palmdale at the end of Highway 58, Highway 58 runs from Bakersfield southeast towards Palmdale, and Towerline Road is just east of Bakersfield." While these facts would have been relevant at trial, they are not material to any of the issues in dispute on appeal. Defendants do not raise any issues on appeal challenging the inference they were headed towards Bakersfield when stopped. Therefore, we conclude "this information has no consequence to the determination of the action" and deny the request. (*People v. Karis* (1988) 46 Cal.3d 612, 643, fn. 23.)

# DISCUSSION

## I. DEFENDANTS HAD A STATUTORY RIGHT TO A JURY TRIAL ON THEIR PLEA OF ONCE IN JEOPARDY

Defendants contend they were entitled to have a jury resolve their pleas of once in jeopardy. We agree.

### A. *Background Facts*

#### 1. 2010 Trial Proceedings

Defendants were initially tried in 2010, but that proceeding ended in a mistrial. Certain events from that first trial are pertinent to this issue and we recount them below.

Prior the first trial, the trial court ruled that the manner in which the Camry and Pacifica had been stopped will "need to [be] sanitize[d]." To that effect, the court excluded all evidence that the Camry and Pacifica had been stopped by a SWAT team, and that officers were wearing raid gear and had "M4" weapons. The court then asked prosecutor Chad Louie: "Mr. Louie, am I clear with you on how we're going to proceed at the scene of the stop on Towerline?" The prosecutor responded, "You are."

On November 1, 2010, the court read the charges to the jury and gave preliminary instructions. As of that date, the prosecutor was apparently unable to locate witness Turner.

On November 4, 2010, the prosecutor informed the court that he had originally planned to call a Deputy Derek Brannan to testify about observing Williams and Michael Johnson exiting the Camry. However, the prosecutor had learned that Brannan had not personally observed that event. ! Rather, a Deputy Bill Starr had observed the event.[23] Consequently, the prosecutor asked that Starr be added to the witness list so that he could elicit direct observations rather than hearsay. The court asked if defense counsel had any objection to adding Starr to the witness list. No attorney objected.

---

[23] The prosecutor incorrectly identified the deputy as Bill "Stark."

Starr was eventually called as a witness and testified as follows:

"Q. Can you describe the vehicle that you saw on that date and that time, at that location?

"A. It was a dark blue Toyota Camry.

"Q. And did you see any occupants of that vehicle?

"A. Yeah.

"Q. Did you see the occupants exit that vehicle?

"A. I recall at least two occupants. I don't recall if there was [*sic*] more.

"Q. At least two of the occupants exited?

"A. Yes.

"Q. Can you describe the occupants for us?

"A. The only thing I recall is they were black male adults.

"Q. Do you remember where they exited from?

"A. No, I don't.

"Q. Did you make – did you end up making contact with that vehicle?

"A. No. I was positioned in the turret of the armored personnel carrier."

Defense counsel immediately moved for a mistrial based on the in limine ruling. The trial judge and all counsel had a chambers conference, which was not transcribed. The parties went back on the record outside the presence of the jury, and the court indicated it was leaning towards granting a mistrial. The prosecutor urged the court not to declare a mistrial "notwithstanding myself failing to inform this witness of that – because this is a last-minute witness." Defense counsel then recounted that during the chambers conference, the prosecutor "admitted that he failed completely to advise this

21.

witness of the Court's rulings regarding the SWAT [*sic*]." The court granted a mistrial and discharged the jury.[24]

### 2. Defendants' Plea and Motion Concerning Prior Jeopardy

After the mistrial was declared, defendants entered additional pleas of once in jeopardy.

Each defendant requested in writing for the issue to be resolved by way of a jury trial. Joseph also moved, in the alternative, to dismiss the indictment. The prosecution opposed these requests.

Judge Brownlee, who had presided over the mistrial, held a hearing on the defense requests. Judge Brownlee concluded that because the prosecutor's intent concerned a procedural matter (i.e., double jeopardy) rather than an issue of guilt or innocence, it was a question of law to be decided by the court.

Judge Brownlee observed that "Mr. Louie [the prior prosecutor] had been in my court several times prior to this trial on general felony-type cases. Did a competent job on those cases. Those cases were not complicated and straightforward." The court also observed that "Mr. Louie was overmatched against the four lawyers for the defense and needed additional assistance from his office. Though none was forthcoming. Nonetheless, he did the best he could." The court also noted its belief that if the first trial had gone to jury, there was no reasonable prospect of acquittal. The court further

---

[24] We wonder whether a curative admonition would have sufficed in lieu of declaring a mistrial. While the presence of an armored personnel vehicle at defendants' arrest may have made them appear dangerous to the jury, that inference would also have been raised by other evidence the jury ultimately would have been exposed to, including the wiretapped conversations, photographs of weaponry found in the Pacifica and surveillance video showing several masked defendants wielding assault weapons. This suggests any additional prejudice to defendants' arising from the evidence that an armored personnel vehicle was involved in their arrest might have been minimal and, possibly, curable. However, the issue of whether Deputy Starr's testimony warranted a mistrial is not before us.

observed that "[Deputy] Starr provided [the offending] testimony not in response to a direct question, but offered it up on his own." The court ultimately concluded that "Mr. Louie's conduct was not intentionally done for the purpose of triggering a mistrial" and denied the defense motions.

The defendants challenged the trial court's ruling in a writ petition to this court. We denied the petition summarily.

After we denied the writ petition, all defendants renewed their objection in the trial court as to proceeding without a jury trial on the once in jeopardy plea.

### B. Double Jeopardy Claims Under Kennedy

The Double Jeopardy Clause of the United States Constitution protects a criminal defendant from repeated prosecutions for the same offense. (*Kennedy*, *supra*, 456 U.S. at p. 671.) The Double Jeopardy Clause also affords a defendant the right "to have his trial completed before the first jury empaneled to try him …."[25] (*Id.* at pp. 673.) Consequently, once a mistrial is declared over the defendant's objection, retrial will only be permitted if the mistrial was declared as the result of a " 'manifest necessity,' " such as a hung jury. (*Id.* at p. 672.)

However, when the defendant requests the mistrial, "different principles come into play…." (*Kennedy*, *supra*, 456 U.S. at p. 672.) When the defendant requests and is granted a mistrial as the result of prosecutorial error, it is ordinarily assumed there is no barrier to retrial. (*United States v. Jorn* (1971) 400 U.S. 470, 485.) However, there is a narrow exception to this rule that arises when "the prosecutor's actions giving rise to the

---

[25] The Double Jeopardy Clause was not always understood this way. Under the English common law and early interpretations of the federal Double Jeopardy Clause, jeopardy attached "only when there has been a conviction or an acquittal – after a complete trial." (*Crist v. Bretz* (1978) 437 U.S. 28, 33.) If that interpretation had been adhered to, many of the issues we face in this case would never have arisen. But that "constitutional understanding was not destined to endure[]" (*ibid.*), as *Kennedy* and other cases demonstrate.

motion for mistrial were done 'in order to goad the [defendant] into requesting a mistrial.' [Citation.]" (*Kennedy*, *supra*, 456 U.S. at p. 673.)[26] Retrial is barred in that circumstance because "the defendant's valued right to complete his trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances…." (*Ibid*.)

The determination of whether a prosecutor intentionally goaded the defense into moving for a mistrial is one that necessarily " 'requires making inferences ….' " (*Jacob v. Clarke* (8th Cir. 1995) 52 F.3d 178, 181–182.) The threshold issue in this case is whether a defendant who pleads once in jeopardy is entitled to have a jury make those inferences and ultimately determine the prosecutor's intent.

### C. Disputed Issues of Fact Underlying a Plea of Once in Jeopardy Must be Tried to a Jury

Under California law, a defendant may not mount a double jeopardy defense of any kind under a plea of not guilty. (§ 1020; see *People v. Leong Fook* (1928) 206 Cal. 64, 72.) In order to present a double jeopardy defense at trial, a defendant must first have entered a special plea of "former acquittal," "former conviction" or once in "jeopardy."[27] (See *Rebstock v. Superior Court* (1905) 146 Cal. 308, 315; see also *In re Burns* (1947) 78 Cal.App.2d 294, 302.) These pleas are favored by the law due to the importance of the double jeopardy rights they are employed to protect. (*Gonzalez v. Municipal Court* (1973) 32 Cal.App.3d 706, 714; *People v. Preciado* (1916) 31 Cal.App. 519, 530.)

---

[26] The California Constitution provides greater double jeopardy protections than the Fifth Amendment to the United States Constitution. (See *Batts*, *supra*, 30 Cal.4th at p. 695.) In addition to the *Kennedy* standard, article I, section 15 of the California Constitution also "bars retrial following the grant of a defendant's mistrial motion … when the prosecution, believing in view of events that unfold during an ongoing trial that the defendant is likely to secure an acquittal at that trial in the absence of misconduct, intentionally and knowingly commits misconduct in order to thwart such an acquittal …." (*Batts*, *supra*, at p. 695.)

[27] The plea of "once in jeopardy" embodies the defense that the defendant has already "been once in jeopardy for the offense charged…." (§ 1016.)

Once the defense of former jeopardy has been raised by special plea, it is generally "an issue of fact … which the jury alone possesse[s] the power to pass upon." (*People v. Bennett* (1896) 114 Cal. 56, 59.) Consequently, when a defendant asserts former jeopardy as a defense at trial, "he is entitled to a resolution by the jury of any material issues of fact raised by the claim…." (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 509, fn. 1 [describing the holding of *People v. Greer* (1947) 30 Cal.2d 589 (*Greer*)].)

This rule is enshrined in two adjacent provisions of the Penal Code: sections 1041 and 1042. Section 1041 provides that "[a]n issue of fact arises: …(3) [u]pon a plea of once in jeopardy." (§ 1041.)[28] In its very next section, the Penal Code provides that issues of fact "shall be tried" to a jury.[29] (§ 1042; see *People v. Ramirez, supra*, 27 Cal.App.3d at p. 670.)

The relationship between these two provisions is clear: "Penal Code, section 1041, specifies how an issue of fact arises and section 1042 sets forth how it shall be tried…." (*People v. Johns* (1959) 173 Cal.App.2d 38, 43.) Consequently, when these statutes are read together, they plainly require that issues of fact arising upon a plea of once in jeopardy be tried to a jury. (§§ 1041(3)–1042; see *Ramirez, supra*, 27 Cal.App.3d at p. 670 ["Viewing the law in its literal terms, a plea of double jeopardy raises an issue of fact [citation]. The Penal Code also provides that all issues of fact in criminal cases are to be tried by a jury unless jury trial is waived [citations]"].)

That a jury must resolve pleas of former jeopardy is also reflected in section 1151. That statute provides that pleas of once in jeopardy are to be resolved by way of a

---

[28] Section 1041 was initially enacted in 1872. Pleas of once in jeopardy were added to the section in 1880. (Amdts. 1880, ch. 118, § 6.)

[29] Section 1042 reads in its entirety: "Issues of fact shall be tried in the manner provided in Article I, section 16 of the Constitution of this state." Since article I, section 16 of the California Constitution guarantees the right to trial by jury (Cal. Const., art I., § 16), this provision means that "issues of fact in criminal cases are to be tried by a jury …." (*People v. Ramirez* (1972) 27 Cal.App.3d 660, 670.)

"verdict." (§ 1151; see *People v. Seneca Ins. Co.* (2003) 29 Cal.4th 954, 957 [in general, the term " 'verdict' " means a "jury verdict"].) Under section 1151, it is the trial court's "duty … to have the jury pass upon" issues raised by a plea of once in jeopardy. (*People v. Hamberg* (1890) 84 Cal. 468, 472–473.) "To do otherwise [is] erroneous…." (*Id.* at p. 473.)

Not surprisingly, California courts have long observed that "it undoubtedly is the law that where the issue of jeopardy is based on questions of fact, it is for the jury to decide. [Citations.]" (*People v. Hess* (1951) 107 Cal.App.2d 407, 426, italics removed; see also *Stone v. Superior Court*, *supra*, 31 Cal.3d at p. 509, fn. 1; *People v. Bennett*, *supra*, 114 Cal. at p. 59; *People v. Severance* (2006) 138 Cal.App.4th 305, 316; *People v. Lachuk* (1935) 5 Cal.App.2d 729, 731; *People v. Frank* (1933) 134 Cal.App. 211, 214.)

California courts have held that the determinative inquiry regarding the right to a jury trial on a plea of once in jeopardy is whether or not the plea raises an issue of fact. And, usually, a plea of once in jeopardy does present an issue of fact. (*People v. Mason* (1962) 200 Cal.App.2d 282, 285; see also *People v. Bechtel* (1953) 41 Cal.2d 441, 445.) As a result, the issue of jeopardy is ordinarily submitted to the jury. (1 Witkin, Cal. Crim. Law 4th (2012) Defenses, § 205(5), p. 680.)

However, like many other questions of fact, the jeopardy determination can become a question of law when (1) the underlying facts are undisputed and (2) there is only one reasonable inference to be drawn from those undisputed facts. (*People v. Mason*, *supra*, 200 Cal.App.2d at p. 285.)[30] Such questions of law may be resolved by the court on a motion to strike the jeopardy plea. (*Ibid.*)

---

[30] This concept does not represent a change to – or even an exception from – the longstanding rule that disputed issues of fact underlying a plea of once in jeopardy must be tried to a jury. Rather, it is a way to identify and describe cases where the rule itself, even as traditionally stated and understood by California courts, does not require a jury trial. Indeed, the rule we adhere to today is even affirmed in cases where the plea was ultimately determined to present a question of law. (See *People v. Newell* (1923) 192

26.

The Supreme Court succinctly summarized the law on this issue in *Stone v. Superior Court*, *supra*, 31 Cal.3d 503:

> "The determination of the *validity* of a claim of double jeopardy is a matter for the trial judge in the first instance. If there is no material issue of fact, the judge rules on the double jeopardy claim. If, however, a material issue of fact exists, then it is for the jury to resolve." (*Id.* at p. 509, fn. 1, italics added.)

*D. Sections 1041(3) and 1042 Apply to Claims Asserted Under Kennedy*

The Attorney General contends that sections 1041(3) and 1042 do not apply to pleas of once in jeopardy that assert *Kennedy*-type claims. We disagree.

> 1. The Plain Language of Sections 1041(3) and 1042 does not Support the Distinction Urged by the Attorney General

The Attorney General argues the cases discussing the right to a jury trial on jeopardy defenses are distinguishable because they involve jeopardy pleas that centered on "whether the defendant was previously tried for the same crime(s)" whereas the jeopardy pleas in the present case are based on alleged "prosecutorial goading to a mistrial." As we explain more fully below, we are unable to adopt this distinction in light of the undifferentiated language of section 1041(3).

When interpreting statutes, we must remain " 'mindful of this court's limited role in the process of interpreting enactments from the political branches of our state

---

Cal. 659, 667 [plea of once in jeopardy "present[s] a question of fact which the jury alone has power to pass upon …"]; *People v. Mason*, *supra*, 200 Cal.App.2d at p. 285 [a plea of once in jeopardy "ordinarily presents a question of fact which the jury has the power to pass upon"]; *People v. Hess*, *supra*, 107 Cal.App.2d at p. 426 ["it undoubtedly is the law that where the issue of jeopardy is *based on questions of fact*, it is for the jury to decide. [Citations.]"]; *People v. Frank* (1925) 75 Cal.App. 74, 80 [defendant who pleas once in jeopardy is "entitled to have the … plea passed upon by the jury"]; *People v. Gelardi* (1946) 77 Cal.App.2d 467, 474 ["generally speaking, former jeopardy is a question of fact, and hence should be passed on by the jury…"], disapproved on other grounds by *People v. Perez* (1965) 62 Cal.2d 769, 776, fn. 2; *People v. Wilkison* (1916) 30 Cal.App. 473, 477 ["it is true in general that a plea of once in jeopardy presents a question of fact which the jury has the right to solve …"].)

27.

government.  In interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law, " ' "whatever may be thought of the wisdom, expediency, or policy of the act." ' " '[Citation.]" (*People v. Loeun*, *supra*, 17 Cal.4th at pp. 8–9.)  Consequently, when construing "any statute, we may not broaden or narrow the scope of the provision by reading into it language that does not appear in it or reading out of it language that does.  'Our office is … "simply to ascertain and declare" what is in the relevant statutes, "not to insert what has been omitted, or to omit what has been inserted." ' [Citation.]" (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 545.) We "may not, 'under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used.'  [Citation.]  Further, ' "[w]e must assume that the Legislature knew how to create an exception if it wished to do so …." [Citation.]' [Citation]." (*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983, 992.)

The Attorney General's contention would have us contravene these principles of statutory construction by injecting a distinction into the statutes that contradicts their plain, undifferentiated language.  Together, sections 1041(3) and 1042 encompass issues of fact arising from pleas of once in jeopardy without qualification.  Nowhere do the statutes indicate that entitlement to a jury trial turns on the particular theory of law underlying the plea of once in jeopardy.  In order to achieve the result urged by the Attorney General, we would have to add an exemption to section 1041(3) for once in jeopardy pleas based on prosecutorial goading.  "The problem with this approach is the one that inheres in most incorrect interpretations of statutes:  It asks us to add words to the law to produce what is thought to be a desirable result." (*EEOC v. Abercrombie & Fitch Stores, Inc.* (2015) ___ U.S. ___ [135 S.Ct. 2028, 2033].)

While it seems most sensible and efficient for a judge to determine the goading issue, there is simply no *statutory* basis for treating once-in-jeopardy pleas based on a

"traditional" double jeopardy theory (i.e., prior conviction or acquittal of the same offense) differently than those asserting *Kennedy*-type claims.

> 2. The Fact that Sections 1041 and 1042 Were Originally Enacted Before *Kennedy*-type Claims were Recognized Does not Alter Our Interpretation of those Statutes

The Attorney General argues that the Legislature could not have intended to require a jury trial here because the theory of prosecutorial goading did not exist when sections 1041 and 1042 were enacted.[31]  This contention is foreclosed by longstanding principles of statutory construction.

" 'Old laws apply to changed situations.  The reach of [an] act is not sustained or opposed by the fact that it is sought to bring new situations under its terms…."  (*Browder v. United States* (1941) 312 U.S. 335, 339–340; accord *Souza v. Lauppe* (1997) 59 Cal.App.4th 865, 874.)  Statutes are "not to be confined to the 'particular application[s] … contemplated by the legislators.'  [Citations.]"  (*Diamond v. Chakrabarty* (1980) 447 U.S. 303, 315–316; accord *Souza v. Lauppe*, *supra*, 59 Cal.App.4th at p. 874.)  Instead, they are interpreted as embracing everything that "subsequently fall within [their] scope …."  (*De Lima v. Bidwell* (1901) 182 U.S. 1, 197.)  As a result, if the statute's language fairly brings a given situation within its terms, "it is unimportant that the particular application may not have been contemplated ...."  (*Barr v. United States* (1945) 324 U.S. 83, 90; accord *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 51 (*Khajavi*); see also *L.A. Unified School Dist. v. Garcia* (2013) 58 Cal.4th 175, 192 (*Garcia*).)

Conversely, there is no principle of statutory interpretation whereby a court would "decline to apply a statute to a situation that its language concededly covers … on the

---

[31] We note that though the jury trial statute at issue here was initially enacted in 1872, it underwent a nonsubstantive amendment in 2002, well after *Kennedy* had been decided.  (Stats.2002, ch. 787, § 20.)

ground that, *if* the enacting [legislature] had foreseen modern circumstances, it *would* have adopted … an exception ….” (*K Mart Corp. v. Cartier, Inc.* (1988) 486 U.S. 281, 324–325 (conc. & dis. opn of Scalia, J.), italics in original.)

These rules of statutory construction reflect several considerations.

First, legislatures “likely cannot[] anticipate all circumstances in which a general policy must be given specific effect….” (*United States v. Haggar Apparel Co.* (1999) 526 U.S. 380, 392.) Consequently, most statutes “are written in general terms and do not undertake to specify all the occasions that they are meant to cover ….” (*Gilbert v. Commissioner* (2d Cir. 1957) 248 F.2d 399, 411.)

Second, even when a legislature likely would have enacted a differently-worded law had it foreseen future developments, any statutory revision reflecting that reality must come from that legislature, not the judiciary. (See *Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 76.)

Courts have applied these interpretive methods in countless cases, refusing to read an exception into a statute merely because a particular application was likely unanticipated by the enacting legislature. (See, e.g., *United States v. Southwestern Cable Co.* (1968) 392 U.S. 157, 172–173; *Barr v. United States*, *supra*, 324 U.S. at p. 90; *United States v. South-Eastern Underwriters Ass'n* (1944) 322 U.S. 533, 556–557, superseded by statute on another point as noted in *United States Dept. of Treasury v. Fabe* (1993) 508 U.S. 491, 499; *Puerto Rico v. Shell Co.* (1937) 302 U.S. 253, 257; *Pickhardt v. Merritt* (1889) 132 U.S. 252, 257; *Newman v. Arthur* (1883) 109 U.S. 132, 137–138; *Garcia*, *supra*, 58 Cal.4th at p. 192; *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 136; *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1461; *Smith v. Pan Air Corp.* (5th Cir. 1982) 684 F.2d 1102, 1113; *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft* (2d Cir. 1967) 375 F.2d 943, 946–947; *Cain v. Bowlby* (10th Cir. 1940) 114 F.2d 519, 522–523; *Jerome H. Remick & Co. v. American Auto. Accessories Co.* (1925) 5 F.2d 411, 411; cf. *Browder v. United*

*States*, *supra*, 312 U.S. at pp. 339–340; *Trs. of Dartmouth College v. Woodward* (1819) 17 U.S. 518, 644–645.)

Turning to our case, we of course acknowledge that the Legislature likely did not have *Kennedy*-type claims in mind when it initially enacted 1041 and 1042 in 1872 or when it amended section 1041 in 1880. "But that is not enough." (*Puerto Rico v. Shell Co.*, *supra*, 302 U.S. at p. 257.) The crucial fact remains that the Legislature "select[ed] broad and unambiguous statutory language …." (*Khajavi*, *supra*, 84 Cal.App.4th at p. 51.) Because the statutory language is clear, " 'it is unimportant that [the statute's] particular application may not have been contemplated.' [Citations.]" (*Ibid.*; accord *Barr v. United States*, *supra*, 324 U.S. at p. 90; *Garcia*, *supra*, 58 Cal.4th at p. 192.)

Put another way, the legislative decision to which we are deferring is not a choice to consciously include *Kennedy*-type claims within the scope of sections 1041 and 1042. Rather, we yield to the Legislature's choice to enact undifferentiated statutory language that plainly encompasses all pleas of once in jeopardy without regard to the underlying legal theory. Though *Kennedy*-based theories of double jeopardy did not exist in 1872, pleas of once in jeopardy did.

It remains entirely possible that if the Legislature had anticipated the emergence of *Kennedy*-type claims, it would have excepted them from the statutory right to a jury trial in section 1042. But these types of riddles are "not ours to solve." (*Republic of Arg. v. NML Capital, Ltd.* (2014) ___ U.S. ___ [134 S.Ct. 2250, 2258].)

### 3. The Plain Language of Sections 1041 and 1042 is not in Conflict with Section 1141

The Attorney General argues our interpretation of sections 1041 and 1042 is "inconsistent" with section 1141.

Section 1141 reads, in full: "In all cases where a jury is discharged or prevented from giving a verdict by reason of an accident or other cause, except where the defendant is discharged during the progress of the trial, or after the cause is submitted to them, the

31.

cause may be again tried." (§ 1141.) This provision is a substantive double jeopardy rule, concerning when a defendant may be retried. Conversely, sections 1041(3) and 1042 simply identify the trier of fact on a jeopardy claim, regardless of which substantive jeopardy theory has been invoked. There is simply no conflict between these statutes.

The true conflict is not between sections 1141 and 1041 through 1042, but instead between section 1141 and *Kennedy* itself. While section 1141 would permit retrial in cases of prosecutorial goading leading to a defense-requested mistrial, *Kennedy* does not. But this conflict between *Kennedy* and section 1141 exists regardless of how sections 1041 and 1042 are interpreted. That is, *Kennedy*-type claims contravene section 1141 regardless of whether those claims are resolved by a judge or a jury. Section 1141 is not inconsistent with our interpretation of sections 1041(3) and 1042.

### 4. The Foreign Decisions Cited by the Attorney General do not Compel a Different Conclusion

The Attorney General cites the decisions of several foreign jurisdictions and notes that many have provided for judicial determinations of prosecutorial intent.[32] But the Attorney General fails to explain how those decisions should bear on our interpretation of California statutes. It is true that a foreign opinion interpreting a "similarly worded statute[], although not controlling, can provide valuable insight[] …" when construing a California law. (*In re Joyner* (1989) 48 Cal.3d 487, 492.) But none of the foreign cases cited by the Attorney General interpreted any relevant statutes whatsoever, much less ones that are similarly worded to sections 1041 and 1042.[33] (See *State v. Michael J.* (Conn. 2005) 875 A.2d 510. 519–520; *State v. Hull* (R.I. 2000) 754 A.2d 84, 87; *State v.*

---

[32] *Batts* makes a similar observation. (*Batts*, *supra*, 30 Cal.4th at p. 688; but see *Collins v. State* (Tex.Crim.App. 1982) 640 S.W.2d 288, 290–291.)

[33] Except arguably *Peden v. State* (Tex.Ct.App. 1996) 917 S.W.2d 941, 954, which is not inconsistent with our holding. That case cited state precedent which interpreted Texas statutes as requiring a trial on pleas of once in jeopardy. (*Ibid.,* citing *Apolinar v. State* (Tex.Ct.App. 1991) 820 S.W.2d 792, 793–794.)

*Kennedy* (Or. 1983) 666 P.2d 1316, 1325, fn. 13; *Byrd v. State* (Ga.Ct.App. 2006) 626 S.E.2d 598, 599; *State v. Major* (N.C.Ct.App. 1987) 352 S.E.2d 862, 865.)

And even if foreign courts had decided that their own states' statutory schemes do not require a jury trial in this context, it would not change our conclusion. (Cf. *Foster v. Vehmeyer* (1901) 133 Cal. 459, 461 ["It is unnecessary to review the many cases cited by appellant from other states, for each state has its own statute bearing upon the procedure to be followed, and it is upon the construction of these various and different statutes that the contrariety of decision has arisen"].) The Attorney General's "contention concerning the practice of other jurisdictions is better addressed to the Legislature, which can evaluate the benefit of joining these other jurisdictions .…" (*Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 965.)

### 5. The Supreme Court Cases Cited by the Attorney General Do not Alter our Conclusion

#### a. *People v. Betts*

In *People v. Betts* (2005) 34 Cal.4th 1039 (*Betts*), the Supreme Court considered whether issues of venue and territorial jurisdiction are to be decided by a judge or a jury. (*Id.* at p. 1043.)

In *Betts*, the Supreme Court observed that section 1126 provides that " 'questions of law are to be decided by the court and questions of fact by the jury.' " (*Betts*, *supra*, 34 Cal.4th at p. 1048, quoting § 1126.) The court then relied on its own precedent establishing that the distinction between questions for the jury and questions for the court under section 1126 " 'turns on whether the issue presented relates to the substantive matter of guilt or innocence to be determined at trial or, instead, concerns a procedural matter that does not itself determine guilt or innocence .…" (*Betts*, *supra*, 34 Cal.4th at pp. 1048–1049, quoting *People v. Posey* (2004) 32 Cal.4th 193, 206.) The court reasoned that while the issues of territorial jurisdiction and venue frequently involve questions of fact, they are "procedural issue[s]" that do not involve a determination of guilt or

33.

innocence. (*Betts*, *supra*, at p. 1049.) Accordingly, those issues may be resolved by the trial court. (*Id.* at p. 1044.)

The Attorney General cites this reasoning from *Betts*. Also, the trial court in this case relied on the procedural-issue-versus-matter-of-guilt distinction in determining the double jeopardy issue need not be submitted to a jury. We, however, find this reasoning inapplicable.

First, the controlling statute in *Betts* was section 1126, not sections 1041 and 1042. The major premise of the *Betts* holding is that under section 1126, issues relating "to the substantive matter of guilt or innocence" are generally for the jury to decide and issues concerning "procedural matter[s] that do[] not determine guilt or innocence" are generally for the court to decide. (*Betts*, *supra*, 34 Cal.4th at p. 1048.) But, unlike section 1126 as interpreted in *Betts*, section 1041 makes it abundantly clear that the issues assigned to the jury under section 1042 are not limited to those impacting the determination of guilt or innocence. Indeed, of the four pleas identified in section 1041, only one always involves the guilt or innocence of the defendant. (§ 1041(1) [plea of not guilty].) At least two of the other pleas – former acquittal/conviction and once in jeopardy – plainly do not involve the guilt or innocence of the accused.[34] (See *United States v. MacDougall* (4th Cir. 1986) 790 F.2d 1135, 1142.) In determining whether an issue must be resolved by a judge or jury, section 1041 clearly sets up a different dividing line than section 1126 as interpreted in *Betts*.

---

[34] Arguably, the fourth plea – not guilty by reason of insanity – also does not implicate the guilt or innocence of the accused. The plea of not guilty by reason of insanity, alone, "admits the commission of the offense charged." (§ 1016(6).) "A plea of not guilty by reason of insanity 'is a statutory defense that does not implicate guilt or innocence but, instead, determines "whether the accused shall be *punished* for the *guilt* which has already been established." [Citation.]' [Citation.]" (*People v. Blakely* (2014) 230 Cal.App.4th 771, 775.)

This distinction between the statutes at issue in *Betts* and the present case highlights the core flaw in the trial court's reasoning in this case.[35]  The trial court concluded that the issue of prosecutorial intent did not need to be submitted to the jury because it involved "a procedural matter … and not one of guilt or innocence."  But that is true of *all* pleas of once in jeopardy.  The trial court's reasoning would mean that *no* once in jeopardy plea (even those based on a "classic" double jeopardy theory) would *ever* be tried to a jury.  Such a result would be impossible to square with sections 1041(3) and 1042.[36]

Moreover, section 1041 expressly inserts pleas of once in jeopardy into the scope of section 1042.  (See *People v. Johns*, *supra*, 173 Cal.App.2d at p. 43 ["Penal Code, section 1041, specifies how an issue of fact arises and Section 1042 sets forth how it shall be tried"].)  We imagine *Betts* would have been decided differently if there had been a statute expressly providing that issues of venue and territorial jurisdiction are questions of fact under section 1126.  Yet it is that hypothetical – not the actual circumstances of *Betts* – that is analogous to the statutory reality we face here.

We are not dissuaded by *Betts*'s observation that trial courts "routinely" decide "whether the prosecution's misconduct that results in a mistrial bars retrial, a decision that requires findings as to the prosecutor's intent [citation] ...."  (*Betts*, *supra*, 34 Cal.4th at p. 1049; see also *id.* at p. 1049, fn. 3.)  Unlike the Supreme Court in *Betts* (and *Batts*, discussed below), we have been expressly called upon by the parties to determine whether this practice – even if routine – complies with sections 1041 and 1042.

---

[35] We do not fault the trial court for failing to apply the appropriate standard in determining whether defendants' pleas needed to be submitted to a jury.  While we believe our conclusions are straightforward, they are nonetheless unprecedented and arguably in tension with doubts expressed by the Supreme Court.  (See *Batts*, *supra*, 30 Cal. 4th at p. 697, fn. 28.)

[36] The Attorney General acknowledges that sections 1041 and 1042 apply to some pleas of once in jeopardy.

### b. *People v. Batts*

The Attorney General also cites to dictum from our Supreme Court expressing "grave doubts that … factual questions regarding the prosecution's intent in committing misconduct are appropriate for resolution by a jury rather than by the court …." (*Batts*, *supra*, 30 Cal.4th at p. 697, fn. 28.) The footnote goes on to say that "as far as we are aware, all courts that have addressed similar double jeopardy issues have assumed that the court, rather than a jury, would make the relevant determination [citation.]"**37** (*Ibid.*, italics in original; but see *Collins v. State*, *supra*, 640 S.W.2d at pp. 290–291.) The court concluded the footnote by observing: "We have no occasion to decide that issue in the present case, however, because none of the parties raised the issue in the trial court." (*Batts*, *supra*, at p. 697, fn. 28.)

We have several observations regarding this language.

First, we note that the footnote is clearly dictum, and essentially identifies itself as such. (*Batts*, *supra*, 30 Cal.4th at p. 697, fn. 28 [noting court had "no occasion to decide" the issue]; cf. *People v. Wiley* (1995) 9 Cal.4th 580, 588 [prior Supreme Court decision's brief mention of state constitutional right to a jury trial not a "considered decision" determining scope of California constitutional right to a jury trial].)

Second, we share the Supreme Court's doubts that these factual questions are "appropriate" for resolution by a jury. But this case has us deciding not whether a jury trial is "appropriate," but instead whether it is required by the Penal Code.

---

**37** *Kennedy*, for example, assumed a court would determine prosecutorial intent. (*Kennedy*, *supra*, 456 U.S. at p. 675 [in contrast to standard urged by concurrence, "a standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact"]; but see *Collins v. State*, *supra*, 640 S.W.2d at pp. 290–291 [interpreting this language from *Kennedy* as merely requiring the determination be made by the finder of fact and whether the finder of fact is the judge or a jury is a matter of state law].)

Third, though this is not made explicit in the text, we think the footnote may best be read as an expression of doubt only as to whether the United States and California Constitutions – rather than the California Penal Code – compel a jury trial in this context.[38]  The *Batts* opinion is almost entirely concerned with constitutional double jeopardy protections, while sections 1041 and 1042 are not mentioned at all.  (*Batts*, *supra*, 30 Cal.4th at pp. 665–705.)  It would be peculiar for us to resolve a statutory construction issue by relying on precedent that does not analyze or even cite the relevant statutes.  (Cf. *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1180 [statute tracing back to 1872 prevails over contrary 2003 Supreme Court opinion that did not address the statute].)

Moreover, the only case cited in the relevant portion of the footnote is the United States Supreme Court's decision in *Kennedy*.  Such a citation would be unusual if used to support the notion that the California Penal Code does not provide for a jury trial, yet entirely appropriate if done to show that a jury trial is not compelled by the United States Constitution.

---

[38] We share our Supreme Court's doubt that the United States or California Constitutions require a jury trial in this context.  However, we need not decide that issue since a jury trial is compelled by statute.  For present purposes, it is sufficient to note that mandating a jury trial by statute in this context is not *prohibited* by the Constitution.  That is, a state legislature may enact greater double jeopardy protections by statute than is constitutionally required.  (See *People v. Homick* (2012) 55 Cal.4th 816, 838.)  Our Legislature has chosen to grant defendants a statutory right to a trial by jury of any disputed, material issue of fact underlying a plea of once in jeopardy.  (§§ 1041–1042.)  Because this statutory scheme is constitutionally permissible, it is irrelevant that other constitutional options – such as removing the issue from the jury – may have been available.  In other words, while the Legislature *may* have the constitutional power to preclude a jury trial in these circumstances, we cannot conclude such a power has been exercised here.  (Cf. *Taylor v. Reynolds* (1891) 92 Cal. 573, 576 (conc. opn. of Beatty, C.J.).)  Our holding is based solely on the statutes which secure the right to a jury trial here.  (Cf. *id.* at pp. 576–577.)

6. The Fact that Policy Considerations May Favor Judicial Resolution of Some Issues of Fact Raised by Once in Jeopardy Plea is Irrelevant Given the Plain Language of the Applicable Statutes

To say, as we do, that there is no statutory basis for treating *Kennedy*-based pleas differently is not to suggest that other approaches are meritless or even inferior.[39] The Attorney General credibly argues that having a judge decide disputed issues of fact regarding prosecutorial intent in this context is "the better rule" because the judge will have witnessed the prosecutor's actions and demeanor during trial and will be familiar with the circumstances of the case.[40] But our role is to determine the *actual* rule enacted by the Legislature, not to declare a "better" rule. (Code Civ. Proc., § 1858.)

While the Attorney General's policy arguments may well be quite valid, they have been presented in the wrong forum. "It is not our function to 'inquir[e] into the "wisdom" of underlying policy choices.' [Citation.] '[O]ur task here is confined to statutory construction.' [Citation.]" (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1263.)

---

[39] To the contrary, we are empathetic to the Attorney General's observations. Indeed, if we were tasked with creating the law on a blank slate, we would not provide for jury trials of *Kennedy*-type claims. We believe that resolving such claims is similar to other tasks normally reserved for judges, not juries. But the same can be said of other double jeopardy issues that also require a jury trial. (E.g., *Greer*, *supra*, 30 Cal.2d at pp. 600–601 [when defendant enters jeopardy plea, jury must decide whether greater and lesser offenses were based on same act], overruled on another point by *People v. Fields* (1996) 13 Cal.4th 289, 308, fn. 6; *People v. Hamberg*, *supra*, 84 Cal. at pp. 472–473 [erroneous for court to have refused to submit issue of jeopardy to jury when claim based on alleged prior conviction].) The fact that resolving *Kennedy*-type claims seems to us to be a classic judicial function provides no basis for distinguishing them from other double jeopardy claims, which also seem best-suited for judicial resolution yet undoubtedly require a jury trial.

[40] Of course, this is only true where the judge who presided over the mistrial also presides over the subsequent proceeding.

7. The Plain Meaning of Sections 1041(3) and 1042 is not Absurd, so as to Warrant Judicial Rewriting of the Statutes

The Attorney General argues that adhering to the literal meaning of sections 1041(3) and 1042 would lead to several absurd results. Consequently, the Attorney General would have us create a judicial exception to the statutes for prosecutorial goading claims.

" ' "The literal meaning of the words of a statute may be disregarded to avoid absurd results …." ' [Citations]."[41] (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1698 (*Unzueta*).) But the absurdity doctrine should only be used in " '*extreme* cases….' [Citation.]" (*People v. Schoop* (2012) 212 Cal.App.4th 457, 470, italics added in original; *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1507; *Unzueta*, *supra*, 6 Cal.App.4th at p. 1698.) There are several reasons courts are reluctant to employ the doctrine.

First, we are largely powerless to perform legislative functions. (See Cal. Const., art. III, § 3 [judiciary may not exercise legislative powers absent authorization by Constitution]; see also Code Civ. Proc., § 1858.) "Each time the judiciary utilizes the 'absurd result' rule, a little piece is stripped from the written rule of law and confidence in legislative enactments is lessened…." (*Unzueta*, *supra*, 6 Cal.App.4th at p. 1699.) Unlike a court's notion of absurdity and the revisions it would impose as a result, the text

---

[41] Earlier cases suggested that the absurd consequences doctrine does not apply when the Legislature's intent is clearly apparent from the language of the statute. (*In re Estate of Letchworth* (1927) 201 Cal. 1, 8.) Even some more recent cases have suggested that courts should *only* resort to the absurd consequences rule if the plain language of the statute fails to reveal a clear meaning. (See, e.g., *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238–1239; but see *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340 [court "need not follow the plain meaning of a statute when to do so would … '[lead] to absurd results' [Citations."].) We note that the language of section 1041(3) "is so plain and clear that any attempt to interpret it would be almost an absurdity[]" itself. (*North American Bldg. & Loan Asso. v. Richardson* (1936) 6 Cal.2d 90, 98.)

39.

of the statute "has successfully braved the legislative gauntlet…." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.*, *supra*, 6 Cal.App.4th at p. 1238.)

Second, "[t]here are few, if any, sources guiding an appellate court on how to apply the absurdity exception to the 'plain meaning rule.' " (*People v. Harbison* (2014) 230 Cal.App.4th 975, 986–987 (Yegan., J., dissenting).) This lack of guidance is dangerous, since "[a]bsurdity … is in the eye of the beholder." (*Unzueta*, *supra*, 6 Cal.App.4th at p. 1698.) Even when we as judges are convinced a statute will lead to absurd results, it remains " ' "infinitely better … to adhere to the words of an Act … and leave the legislature to set it right than to, alter those words according to one's notion of an absurdity." [Citation.]' [Citation.]" (*Ibid.*; *People v. Pecci*, *supra*, 72 Cal.App.4th at p. 1507.)

The Attorney General makes several attempts to clear the high bar set by this state's absurdity jurisprudence. Most of these contentions concern the burden jeopardy jury trials will place on trial courts and the anticipated difficulty of managing the proceedings. But "[m]ere inconvenience resulting from a construction according to the clear meaning of a statute will not justify the courts in ignoring its terms." (58 Cal.Jur. 3d Statutes, § 108, fn. omitted.) For the reasons explained below, we conclude that we may not rewrite the statutes under the absurd consequences doctrine.

### *Evidentiary Issues*

The Attorney General argues the scope of the evidence presented at the jeopardy proceeding would be "unwieldy." Below we address the specific hypotheticals and examples posed by the Attorney General. But first, we note as a general matter that the trial judge has authority to limit the "evidence and the argument of counsel to relevant and material matters…." (§ 1044.) And the trial court is empowered to exclude even relevant evidence under Evidence Code section 352. We anticipate trial courts will diligently utilize the "undue consumption of time" and "confus[ion] of the issues" prongs

of Evidence Code section 352 to streamline the presentation of evidence at jeopardy trials.

### Calling the First Prosecutor to Testify

The Attorney General notes that at the type of jury trial contemplated here, prosecutors would likely be called to testify regarding the allegations of misconduct underlying a defendant's plea. We do not see this eventuality as undesirable. To the contrary, the prosecutor's testimony concerning his or her own state of mind would likely be highly relevant to any *Kennedy*-type claim.

### Calling Judge Brownlee to Testify

The Attorney General next claims that the judge who presides over the mistrial might be called as a witness in a subsequent jeopardy trial. However, that possibility is foreclosed by statute. (See § 1321; Evid. Code, § 703.5; but see *People v. Fatone* (1985) 165 Cal.App.3d 1164, 1184.)[42]

"The rules for determining the competency of witnesses in civil actions are applicable also to criminal actions and proceedings, except as otherwise provided" in the Penal Code. (§ 1321.) One such rule regarding the competency of witnesses in civil actions is contained in Evidence Code section 703.5, which provides: "No person presiding at any judicial … proceeding … shall be *competent* to testify, in any subsequent civil proceeding, as to any statement, conduct, decision or ruling, occurring at or in conjunction with the prior proceeding…." (Evid. Code, § 703.5, italics added.)

Therefore, the judge who presided over the mistrial could not be called to testify at a later jeopardy trial as to "any statement, conduct, decision or ruling, occurring at or in conjunction with" the mistrial. (See Evid. Code, § 703.5; § 1321.)

---

[42] *People v. Fatone*, *supra*, 165 Cal.App.3d 1164 apparently failed to consider section 1321.

<u>Pretrial Rulings</u>

The Attorney General next claims that the jeopardy jury would need to hear evidence about "all" of the in limine proceedings leading up to the mistrial. We disagree. The jury would only need to consider evidence of the in limine proceedings relevant to the prosecutorial goading inquiry. For example, if this case proceeds to a jeopardy trial on remand, the jury would need to consider the in limine ruling concerning evidence of defendants' arrest, which the prosecutor failed to convey to Deputy Starr. In other contexts, we ask juries to determine whether someone "willfully violated [a] court order" (CALCRIM No. 2700), which necessarily requires that the jury consider evidence of the court order, determine its scope, and identify the relevant conduct it prohibits or requires. We see no meaningful distinction between that circumstance and a jeopardy jury's consideration of the pretrial ruling in this case.

<u>Evidence Admitted at the First Trial</u>

The Attorney General also notes the jeopardy jurors would need to hear evidence admitted at the first trial up to the point a mistrial was declared.[43]

But there is nothing absurd or even uncommon about this circumstance in the double jeopardy context. Evidence from prior trials relevant to a jeopardy determination is often admitted at a subsequent jury trial. (See, e.g., *People v. Warren* (1940) 16 Cal.2d 103, 108; *People v. James* (1893) 97 Cal. 400, 400–402; *People v. Majors*, *supra*, 65 Cal. at pp. 139–140; *People v. McDougal* (2003) 109 Cal.App.4th 571, 576; *People v. Finch*

---

[43] The Attorney General doubts that the reporter's transcript from a mistrial could be used in a later jeopardy trial because it would be inadmissible hearsay. This problem would only arise if the parties refused to simply submit to the jury an agreed-upon summary of relevant evidence from the first trial. (See, e.g., *People v. Majors* (1884) 65 Cal. 138, 139–140 [evidence of prior trial submitted in summary fashion through stipulation] superseded by statute on another point as noted in *Kellett v. Superior Court* (1966) 63 Cal.2d 822, 826, fn. 4.) Absent a stipulation, a party could still use the reporter's transcript from the first trial to introduce testimony for any unavailable witnesses. (See Evid. Code, § 1291.)

(1963) 213 Cal.App.2d 752, 760; *People v. Demes* (1963) 220 Cal.App.2d 423, 433–434, disapproved on other grounds by *People v. Collie* (1981) 30 Cal.3d 43, 64, fn. 19; *People v. Dukes* (1934) 2 Cal.App.2d 698, 699–700; *People v. Kelly* (1933) 132 Cal.App. 118, 119–122; *People v. Clinton* (1926) 78 Cal.App. 451, 453; *People v. Castilla* (1915) 28 Cal.App. 190, 191–192.)

The Attorney General argues that a *Kennedy/Batts* jury trial is more onerous than other types of double jeopardy trials. But "more onerous" is not synonymous with absurd. And while we are sensitive to any additional burdens on our trial courts, we do not see the contrast with other jeopardy trials being as stark as the Attorney General suggests.

To make this point, the Attorney General provides the example of a jury considering a plea of former acquittal. In that context, the Attorney General argues, the jury would merely be required "to review conviction records in conjunction with guilt-phase evidence to determine whether the defendant was acquitted in the prior case and *whether that conviction was for the same conduct at issue in the current trial*." (Italics added.) But that inquiry, especially the second prong of the Attorney General's formulation, may pose many of the same problems faced here. To determine whether the defendant's prior conviction was based on the same conduct at issue in the current trial, the jury would have to go through the evidence admitted at the first trial. And jurors would also likely need to analyze mixed issues of law and fact and evaluate the indictment or information, abstract of judgment, verdict, and jury instructions.

### *Greer*

In a similar vein, consider the actual case of *Greer*, *supra*, 30 Cal.2d 589. In that case, the defendant was charged with lewd and lascivious conduct with a minor under the age of 14 and statutory rape of a minor under the age of 18. Both charges arose from a single incident where the defendant had forced himself upon his 13-year-old stepdaughter.

43.

In a previous trial, the defendant had been charged with the same two charges he currently faced, plus a charge of contributing to the delinquency of a minor under the age of 21.  (*Greer*, *supra*, 30 Cal.2d at p. 595.)  The prior jury convicted the defendant on the charge of contributing to the delinquency of a minor but failed to reach a verdict on the statutory rape and lewd and lascivious conduct charges.  (*Ibid.*)

The defendant "pleaded double jeopardy" before his second trial.[44]  (*Greer*, *supra*, 30 Cal.2d at p. 595.)  However, the trial court ruled that the defendant could not introduce evidence of the previous prosecution at trial.  (*Id.* at pp. 596, 600.)  The defendant claimed this was error and the Supreme Court agreed.

The Supreme Court first observed that the conviction of a lesser included offense is a bar to prosecution for a greater offense.  (*Greer*, *supra*, 30 Cal.2d at p. 597, citing *People v. Krupa* (1944) 64 Cal.App.2d 592.)  The court then held that contributing to the delinquency of a minor under the age of 21 is a lesser included offense of both statutory rape of a minor under the age of 18 and lewd and lascivious conduct with a minor under the age of 14.  (*Greer*, *supra*, at pp. 597–598.)

However, the court also observed that even though one offense was necessarily included in the two others, the defendant could nonetheless be convicted of all three, but only "if separate acts served as the basis for each count…."  (*Greer*, *supra*, 30 Cal.2d at p. 600.)  The Supreme Court said the determination of whether the counts were based on separate acts was "*a question for the jury* …."  (*Id.* at p. 600, italics added.)  Therefore, the Supreme Court held the "defendant had the right to attempt to prove his previous

---

[44] It is unclear exactly which jeopardy plea defendant entered, since there is no plea of "double jeopardy."  (See § 1016.)  Other language in *Greer* suggests the defendant actually offered two jeopardy pleas: once in jeopardy and former acquittal.  (*Greer*, *supra*, 30 Cal.2d at p. 595 [the defendant "contended that he had been acquitted of the present offenses and had been once in jeopardy"].)

conviction for purposes of asserting the double jeopardy bar. [Citation.]" (*People v. Fields*, *supra*, 13 Cal.4th at p. 306, fn. omitted.)

Many of the arguments the Attorney General asserts against jury trials on *Kennedy*-type claims apply with similar force to *Greer*'s requirement that the issue of separate acts underlying a jeopardy claim must be submitted to a jury.

Under the specific facts of *Greer*, the new jury on remand would have needed to determine whether the first jury's conviction for contributing to the delinquency of a minor was based on the same act as the current charges of statutory rape and lewd and lascivious conduct. This would necessarily require introducing most or all of the evidence from the first trial.

And, requiring submission of the "separate acts" issue to a jury would put a greater strain on judicial resources than the pretrial ruling procedure used by the *Greer* trial judge.

Moreover, a strong argument could be made that the trial judge at the *Greer* defendant's first trial would be better situated to compare the evidence from the first trial to the allegations in the post-mistrial information.

Nonetheless, *Greer* requires jury determination of the issue.

Surely there would be differences between a jury trial on a *Kennedy*-type double jeopardy claim and a jury trial on a double jeopardy claim under *Greer*. But none of those differences are substantial enough to justify declaring one absurd and the other not.

Jury Instructions

The Attorney General also contends the instructions to the jeopardy jury will be novel. It is true that California does not currently have applicable pattern jury instructions, given that there is no published case recognizing that sections 1041(3) and 1042 apply to pleas of once in jeopardy asserting *Kennedy*-type claims. And it is regrettable that the interaction between section 1042 and *Kennedy* has created this burden for trial courts. We do note that at least one other state has already created pattern jury

45.

instructions for certain *Kennedy*-type claims. (See Elizabeth Berry, et al., Texas Criminal Jury Charges, § 3:800 (2011).)**45**

Adhering to the plain language of sections 1041(3) and 1042 entails several regrettable burdens, including the need to craft applicable jury instructions. But it cannot be said those consequences are absurd. "Inconvenience or hardships, if any, that result from following [a] statute as written, must be relieved by legislation … Construction may not be substituted for legislation." (*United States v. Missouri P. R. Co.* (1929) 278 U.S. 269, 277–278.)

### Separate Juries for Jeopardy and Guilt Determinations

In a request for supplemental briefing we raised the possibility of needing to have separate juries for guilt and jeopardy since evidence of the mistrial-inducing misconduct would be highly relevant to the jeopardy determination but also highly prejudicial to the guilt determination. The Attorney General agreed that separate guilt and jeopardy juries will often be required and argues that the strain on judicial resources this will cause is too great.**46**

---

**45** Alabama also apparently permits jury trials in circumstances like those presented here. (See *State v. Darling* (Ala.Crim.App. 2003) 878 So.2d 323, 326 [interpreting Alabama Rule of Criminal Procedure 15.4 as allowing "a jury to be empaneled to determine the factual question whether the prosecutor's actions in the first trial were intended to provoke the defendant into moving for a mistrial"].)

**46** Several defendants dispute this conclusion and suggest that a single jury could determine both issues in a bifurcated proceeding by considering jeopardy first, then guilt. Joseph argues that jurors can be instructed to disregard jeopardy evidence when they are making the later guilt determination. We do not agree that this is a viable option. By definition, a mistrial will have been declared before any *Kennedy*-type claim is made. And mistrials should only be granted if the prejudice is "incurable by admonition or instruction. [Citation.]" (*People v. Mendibles* (1988) 199 Cal.App.3d 1277, 1310–1311.) Consequently, unless the initial mistrial was improperly granted when an admonishment would have sufficed, a defendant's *Kennedy*-type claims will always be based on evidence or conduct so prejudicial that it cannot be cured by instruction.

Defendant Joseph also suggests the jeopardy evidence could be sanitized and the jury prevented from knowing the exact nature of the evidence that induced the mistrial.

46.

First, we note that the Attorney General acknowledges that in this case, only one jury would need to be empaneled on remand.

Second, we observe that a similar argument was made against permitting bifurcation of jury trials on prior conviction enhancements from the underlying charges. (See *People v. Calderon* (1994) 9 Cal.4th 69, 77.) Yet, the Supreme Court rejected the argument, concluding that "the state's legitimate interest in conserving judicial resources is insufficient to justify denying a defendant's request to bifurcate the trial when having the jury determine the truth of a prior conviction allegation concurrently with the defendant's guilt of the currently charged offense would pose a substantial risk of undue prejudice to the defendant." (*Ibid*.) We adopt similar reasoning here. While the state has a legitimate interest in conserving judicial resources, that interest is outweighed by the defendant's interest in avoiding the substantial risk of undue prejudice that would be posed by the guilt jury considering prejudicial jeopardy evidence.[47]

### *Proposed Procedure, Applicable in Certain Circumstances, to Mitigate Burdens on Trial Court and Juror Pool*

Given the substantial burden today's holding will place on trial courts and juror pools, we have considered alternative procedures that might mitigate these burdens in future cases while adhering to statutory mandates. We set forth one of those possible alternatives below.

When a defendant makes a meritorious request for a mistrial on the basis of prosecutorial error or misconduct, the court could simply allow the defendant to interpose a plea of once in jeopardy and have the *Kennedy* issue submitted to the current jury

---

We disagree, at least on the facts of this case. The nature of the question posed to Deputy Starr and his response is an important piece of evidence concerning the prosecutor's intent and the jury would need to consider it in detail.

[47] We also note that if the jeopardy jury decides in favor of the defense, the need for a guilt trial would be obviated.

before they are discharged. The jury would be instructed to return a verdict only on the issue of jeopardy, and a mistrial would then be declared as to all substantive counts and allegations.

This procedure would serve several interests. First, it would obviate the need to empanel two separate post-mistrial juries. Second, the "mistrial jury," would presumably be in a far better position than a subsequently empaneled jury to determine the likelihood of acquittal at the time of the alleged misconduct. The "mistrial jury," will have observed the proceedings first-hand, including the conduct and demeanor of counsel and witnesses and the introduction of evidence.

The suitability of this procedure may depend on several considerations, including how much of the trial has been conducted and whether the jury actually witnessed the alleged misconduct of the prosecutor. Since this proposal is impossible to implement here we simply raise it as a possibility for courts to consider in the future in the hope it can mitigate the burdens that may be imposed by today's holding.

E. Trial Courts May Strike a Defendant's Plea of Once in Jeopardy in Certain Circumstances

On a motion by the prosecution,[48] a jeopardy plea may be stricken pretrial when the defendant fails to support the plea with proof, or the facts are undisputed and give rise to only one reasonable inference. (See *People v. Mason*, *supra*, 200 Cal.App.2d at pp. 283–285; see also *People v. Hernandez* (2000) 22 Cal.4th 512, 528 (Brown, J., concurring); *People v. Severance*, *supra*, 138 Cal.App.4th at p. 316; *People v. Ceja* (2003) 106 Cal.App.4th 1071, 1083–1084; *People v. Powell* (1974) 40 Cal.App.3d 107, 142–144; 4 Witkin, Cal. Crim. Law 4th (2012) Pretrial, § 288, pp. 556–557 [trial court may strike jeopardy plea in certain situations].) This rule also applies to jeopardy pleas based on *Kennedy*-type claims. When a defendant enters a jeopardy plea based on a

_____

[48] We presume the trial court could also consider striking the plea on its own motion.

*Kennedy*-type claim, the prosecution or trial court may move to strike the plea pretrial. The court would then receive evidence,[49] and if no issue of fact is presented – either because the facts are disputed and give rise to only one reasonable inference, or because the defendants offered no proof in support of the plea – the trial court may strike the plea without submitting it to a jury. (See *People v. Mason*, *supra*, 200 Cal.App.2d at p. 285.) If, however, a question of fact is presented, the plea must be submitted to a jury. (§§ 1041(3)–1042.)

Here, the trial court employed the wrong standard for determining whether a judge, rather than a jury, could adjudicate defendants' once-in-jeopardy pleas. The trial court concluded that because defendants' jeopardy pleas did not present an issue of guilt or innocence, they could be adjudicated by a judge. As explained above, that is not the applicable standard. Instead, the correct standard is whether the evidence concerning defendants' pleas are undisputed and give rise to only one reasonable inference (i.e., whether the pleas present solely an issue of law). Therefore, on remand, the prosecution or trial court may move to strike defendants' pleas without submitting them to a jury. The court may only grant the motion if: (1) defendants are first given an opportunity to present evidence concerning the goading issue (e.g., the testimony of the prosecutor at the first trial, and Deputy Starr) and (2) the court thereafter determines that the facts are

---

[49] The trial court has some discretion how it will receive evidence (e.g., declarations, offers of proof, live testimony, etc.), so long as the defendant has an adequate opportunity to raise an issue of fact in support of the plea. On the one hand, a defendant cannot be penalized for failing to support his plea if he is unable to do so because of evidentiary limitations imposed by the trial court. (Cf. *People v. Preciado*, *supra*, 31 Cal.App. at p. 532.) Conversely, when limiting the parties to particular types of evidence (e.g., declarations, transcripts, offers of proof, etc.) will not hamper defendant's ability to raise an issue of fact in support of the plea, a formal evidentiary hearing may be unnecessary.

undisputed and give rise to only one reasonable inference.**50**  Otherwise, the issue must be submitted to a jury.

*F. Conclusion*

Therefore, consistent with a long line of cases and clear statutory directives, we hold that whenever *any* plea of once in jeopardy presents a question of material fact, it must be resolved by a jury, unless a jury trial is waived.  (§§ 1041(3), 1042.)

Other circumstances related to the plea – such as the specific theory of double jeopardy on which the plea is based – are not independently relevant to whether a jury trial is required under the undifferentiated language of sections 1041(3) and 1042.  As a result, it is inconsequential that the factual issue underlying the pleas in this case (i.e., prosecutorial intent) differs from the one underlying a "traditional" double jeopardy claim (i.e., identity of offenses).

Remedy

"[W]hen the validity of a conviction depends solely on an unresolved or improperly resolved factual issue which is distinct from issues submitted to the jury, such an issue can be determined at a separate post-judgment hearing and if at such hearing the issue is resolved in favor of the People, the conviction may stand.  [Citation.]"  (*People v. Gaines* (2009) 46 Cal.4th 172, 180, internal quotes omitted.)  We conclude that such a disposition is appropriate for the error we have identified here.**51**  Consequently, we will

---

**50** Alternatively, the court may also strike the pleas if defendants present no evidence whatsoever.  (See *People v. Mason*, *supra*, 200 Cal.App.2d at p. 285.)

**51** The Attorney General agrees that if defendants are entitled to a jury trial on their jeopardy pleas, the matter can be remanded for that purpose.  However, some, but not all, defendants assert that since they were deprived of the right to trial on the jeopardy issue, they should also be retried on the issue of guilt.  We disagree.  The issue of jeopardy is "distinct from issues submitted to the jury" at the second trial (i.e., guilt or innocence).  (*People v. Gaines*, *supra*, 46 Cal.4th at p. 180, internal quotes omitted.)  Therefore, a conditional reversal without directions to conduct a new guilt trial is appropriate.  (Cf. *ibid*.)

conditionally reverse the judgment and remand for proceedings consistent with this opinion.

On remand, the trial court may strike defendants' pleas without submitting them to a jury only if (1) defendants are first afforded an opportunity to present evidence in support of their pleas and (2) the trial court concludes thereafter that defendants have raised no question of fact (i.e., the facts concerning the pleas are undisputed and there is only one reasonable inference to be drawn from those undisputed facts). If the court strikes defendants pleas, it shall then reinstate the convictions and true findings (except the conviction on count 22.)[52]

If, however, the court concludes defendants raised an issue of fact material to their jeopardy pleas, the issue must be resolved by way of a jury trial.[53] If the People prevail at trial, defendants' convictions (except count 22) and true findings shall be reinstated and defendants resentenced. If the defendants prevail at trial, their convictions and true findings shall not be reinstated.

---

[52] The Attorney General concedes that conviction "must be reversed for insufficient evidence." We accept the concession and, accordingly, our reversal of that conviction is not conditional.

[53] At the trial, defendants would bear the burden of proof. (*People v. Ceja*, *supra*, 106 Cal.App.4th at pp. 1085–1086; *People v. Ferguson* (1982) 129 Cal.App.3d 1014, 1023; *People v. Newell*, *supra*, 192 Cal. at p. 667; *People v. Mason*, *supra*, 200 Cal.App.2d at p. 285.) The Attorney General argues that once the defendants make a nonfrivolous showing, the burden shifts to the prosecution to disprove the pleas by preponderance of the evidence. The Attorney General relies solely on *People v. Smith* (2005) 132 Cal.App.4th 1537, 1549 for this assertion, but that reliance is misplaced. *Smith* itself acknowledges that in "usual circumstances, the burden is on the defendant to prove that he or she has been placed in double jeopardy by reason of a prior conviction or acquittal…." (*Smith*, *supra*, 132 Cal.App.4th at p. 1548.) It went on to hold that in the "unusual context" of the case, a burden-shifting approach was appropriate. (*Id.* at p. 1549.) This approach, however, was "necessitate[d]" by "unique circumstances associated with the prosecution's charging decisions" in the case. (*Ibid.*) Since those circumstances are not present here, the standard rule applies and defendants bear the burden on their special pleas. (See *People v. Burkhart* (1936) 5 Cal.2d 641, 643.)

## II. THE TRIAL COURT DID NOT ERR IN DENYING BELL'S *MARSDEN* MOTION[*]

Before trial, Bell requested a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). On appeal, Bell argues the court erred in denying his *Marsden* motion. The facts surrounding this issue are set forth below.

### A. Factual Background

At Bell's arraignment on May 14, 2008, attorney Charles Soria (Soria) was appointed as his counsel. Bell told Soria that he wanted to hire attorney Bryant Calloway (Calloway) to represent him. On December 23, 2008, Soria filed a motion to substitute Calloway in as counsel for Bell, which the court denied. On May 6, 2009, Calloway himself moved to substitute in as Bell's counsel, and the court granted the request. The court continued the trial for more than a month to allow counsel time to prepare.

Calloway did not appear at a July 2009 hearing, and on October 19, 2009, the court ordered a continuance because Calloway's license to practice law had been suspended. The court reappointed Soria as counsel and set trial for June 21, 2010.

On June 10, 2010, attorney K. Marshall Bowman (Bowman) requested to substitute in as counsel for Bell. The court granted Bowman's request to substitute and continued the trial to September 27, 2010.

Trial began in October 2010. On November 4, 2010, the court declared a mistrial as to all counts.

On March 4, 2011, Bowman filed a motion for a "*Harris* appointment."[54] In a declaration, Bowman said that his retainer agreement with Bell excluded retrial absent additional attorney fees, which Bell could not afford. As a result, Bowman requested that he be appointed as counsel at the government's expense. The court denied the motion,

---

[*] See footnote, *ante*, page 1.

[54] See *Harris v. Superior Court of Alameda County* (1977) 19 Cal.3d 786 (*Harris*).

relieved Bowman as counsel, and referred Bell to the Indigent Defense Program for appointment of counsel.[55]  Soria was eventually reappointed as counsel for Bell.

Bell requested a hearing pursuant to *Marsden* (1970) 2 Cal.3d 118.  At the hearing, Bell complained that Soria had not spoken to him about strategy.  The court asked when Soria had last met with Bell.  Bell said Soria had met with him "last Sunday" but did not stay long.  Prior to that meeting, Soria had met with Bell a week earlier.[56]

Soria responded that Bell had consistently maintained that he wanted a private attorney and "never wanted to talk to" Soria for that reason.  When Bell told Soria of his complaint in a prior meeting, Soria said, "Well, you never wanted to talk to me.  Do you want to talk to me now?"  Soria went on to explain several areas of interest to the defense including DNA evidence, possible double jeopardy violations, and "wiretap issues."

Bell claimed that Soria should have had an investigator work to disprove allegations that people were watching Bell's "baby mama[s'] house" from five doors down.

Bell also claimed that on a prior occasion, Soria was sleeping in court.  Bell later explained that he had heard secondhand that Soria fell asleep at trial.  The court said that if Soria slept during trial it would "obviously" be a concern.  The judge then noted that

---

[55] Bell claims the court erred in denying the request to appoint Bowman pursuant to *Harris*.  Such claims are subject to harmless error review.  (*People v. Chavez* (1980) 26 Cal.3d 334, 348–349.)  Because Bell has not established that Soria provided ineffective assistance of counsel, there was no prejudice in the court's decision to relieve Bowman and appoint Soria.

[56] In his opening brief, Bell claims he told the court at the *Marsden* hearing that Soria had only seen him once since being reappointed to the case.  We read the record differently.  At the hearing, Bell said that he had met with Soria "last Sunday."  The court eventually asked, "[W]hen was the time before that that you met with him?"  Bell responded, "Probably about the following Sunday or – or probably a week before that."  Thus, the record shows that Bell informed the court he had met with Soria twice shortly before the hearing.  Moreover, there is no indication in the transcript that these two meetings were the only ones Bell and Soria had after the reappointment.

Soria was in the middle of another trial before him and was not sleeping. The court concluded its discussion of the issue by noting that if Soria ever did fall asleep, "then that would be an issue," but "that's not been my experience with Mr. Soria."

Finally, Bell claimed that Soria had not "sent an investigator out" for two and one-half years.

The court ordered a recess in the hearing so that Bell and Soria could speak to one another. When the hearing resumed, the court asked Bell whether he had anything he wanted to tell the court after his conversation with counsel. Bell responded that he had nothing to add.

The court ruled that it did not appear "Soria has done anything other than what he's supposed to do in this case, which is prepare and review all records, issues in the case, the transcript from the prior mistrial." The court noted that Soria had "been at somewhat of a disadvantage periodically … given the fact that there have been two other attorneys that have off-and-on represented Mr. Bell." The court also observed that a disagreement regarding tactics and strategy is not a sufficient reason to require substitution of counsel. Finally, the court said it did not believe Bell's relationship with Soria had "broken down to the extent necessary" to grant the motion.

*B. The Trial Court did not Err in Denying Bell's Marsden Motion*

Bell's claims that Soria did not communicate with him often enough about trial strategy. At the outset, we note that " 'the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence' [citation]" for *Marsden* purposes. (*People v. Cole* (2004) 33 Cal.4th 1158, 1192.) Moreover, Soria said that he had met with Bell on multiple occasions, but Bell "never wanted to talk." A " 'trial court need not conclude that an *irreconcilable* conflict exists if the defendant has not tried to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness.' [Citation.]" (*Ibid.*, italics in original.)

54.

Bell also claims that Soria did not adequately investigate the facts and prepare for trial. Bell argues that the trial court's "fundamental" error "was the rationalization that Soria's lack of preparation could be excused because he" anticipated being replaced as counsel. This contention mischaracterizes the trial court's conclusions. Regardless, Bell's "complaints regarding [counsel's] purported inadequate investigation, trial preparation, and trial strategy were essentially tactical disagreements, which do not by themselves constitute an 'irreconcilable conflict.' [Citation.]" (*People v. Cole*, *supra*, 33 Cal.4th at p. 1192.)

The court did not err in denying Bell's *Marsden* motion.

## III. DEFENDANTS CANNOT SHOW THEY WERE PREJUDICED BY THE TRIAL COURT'S DENIAL OF THEIR MOTION TO CHANGE VENUE*

Before trial, defendants moved to change venue. They cited several news accounts concerning the underlying events at issue in defendants' trials, as well as the legal proceedings themselves. The reports were found across several media, including television, newspapers, and the internet. The majority of the cited coverage was published either in print or online by the Bakersfield Californian, a local newspaper. Defendants argue they could not have received a fair trial because the media coverage was extensive and inflammatory.

### A. Law of Venue

A superior court must order change of venue on a defense motion, "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033.) In determining whether it was reasonably likely a defendant could have received a fair trial, we consider several factors, "including the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the defendant's status within the community, and the victim's

---

* See footnote, *ante*, page 1.

55.

prominence….” (*People v. Rountree* (2013) 56 Cal.4th 823, 837.)  A trial court errs in denying a motion for change of venue if, at the time, there was a reasonable likelihood that a fair and impartial trial could not be had in the county.  (See *ibid.*, § 1033.)

However, even if error is shown, defendants must also demonstrate prejudice to justify reversal of the judgment.  (*People v. Rountree*, *supra*, 56 Cal.4th at p. 837.)  That is, defendants must show “that it is reasonable likely [they] did not in fact receive a fair trial.  [Citation.]” (*Ibid.*)

When a defendant is unable to show prejudice, “we need not decide whether the court erred in denying a change of venue ….”  (See *People v. Johnson* (2015) 60 Cal.4th 966, 983.)  For the reasons explained below, we conclude that defendant is unable to show prejudice and therefore do not reach the issue of error.[57]

B.  Prejudice

1.  The Record Demonstrates that the Jurors who Heard About the Case Either Formed No Preconceived Ideas of the Four Defendants’ Guilt or Affirmed They Would Set Aside All Information Learned from the Media

a.  *Four of the Jurors who Heard About the Case in the Media Affirmed they Would Disregard the Information and only Consider Evidence Received in the Courtroom*

At voir dire, five of the jurors who were ultimately seated said they heard of the case from media accounts.  As recounted in detail below, four of the jurors unequivocally affirmed they would disregard the media accounts and only consider evidence received in the courtroom.

---

[57] We also note that Lewis, Williams and Joseph had peremptory challenges available, yet did not use them on any of these five jurors.  (See *People v. Price* (1991) 1 Cal.4th 324, 393; *People v. Daniels* (1991) 52 Cal.3d 815, 854.)

56.

Juror 2290579

Juror 2290579 only heard about the case from what she read in the Bakersfield Californian, which was "not a whole lot." The juror said she would set aside the information she had read in the newspaper and consider only the evidence and testimony received in court.

Juror 2375732

Juror 2375732 read about the case several years prior to voir dire. He did not remember any specifics, he "just heard about a casino." The juror affirmed he would be able to set aside the media accounts and only consider the evidence and testimony in court.

Juror 2294657

Juror 2294657 remembered hearing "a little bit about it on the news when it happened." The juror affirmed she would not consider anything she heard before, and would only consider evidence and testimony received in court.

Juror 2301135

All juror 2301135 had heard was that "it" had been robbed. The juror affirmed the information could be disregarded.

As to these four jurors, defendant cannot show prejudice because "it is sufficient if [jurors] can lay aside their impressions and opinions and render a verdict based on the evidence presented in court. [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 819; see also *People v. Rountree*, *supra*, 56 Cal.4th at p. 840.)

> b. *The Record Shows that the Fifth Juror who Heard About the Case in the Media did not Form Any Preconceived Notions Regarding the Four Defendants' Guilt*

Juror 2201455

A fifth juror (No. 2201455) was equivocal in his responses about disregarding information he gleaned from media accounts. The juror said he could not "erase" the

information he had heard, but when asked whether he could limit his consideration to the information presented in the courtroom, he said, "I'd like to think I can, yes."

While the juror's responses on that issue were equivocal, he was clear regarding the type of information he had gleaned from media reports. Though he followed the case closely in media accounts, "all" he knew from those reports was that a crime had been committed and some people "got pushed around."[58] He did not read anything about who committed the robberies, what they looked like, or "anything like that." That the juror acquired such limited information from the media accounts strongly indicates that he did not form preconceived ideas regarding the four defendants' guilt.

Additional statements made during voir dire bolster this conclusion. Juror 2201455 explained, "I'm not trying to say I feel like they're innocent or guilty or anything right now because I don't know." The juror said he was not claiming he "can't do the job" of a juror, he just wanted the court and counsel to know he had heard of the case. One defense counsel later asked the juror whether his client had a presumption of innocence, and the juror responded, "Yes." Counsel then asked: "There's no preconceived idea about that at this point?" The juror responded, "No."

On the whole, juror 2201455's responses demonstrate that he had not formed preconceived ideas of these four defendants' guilt.

> 2. The Jurors Were Instructed to Consider Only Evidence Presented at Trial and Presumably Followed those Instructions

All the jurors were instructed to only consider evidence presented at trial. In addition, several of the five jurors who had heard of the case in the media were told one-

---

[58] At trial, it was not disputed that *a* crime had been committed by someone. Thus, even if juror 2201455 came to the preconceived conclusion that *a* crime had been committed, it would not have prejudiced defendants. (See *People v. Rountree*, *supra*, 56 Cal.4th at p. 841.)

on-one by the court to disregard information gleaned from media reports.[59] We presume that jurors generally follow instructions to disregard media coverage they happen to have seen or heard. (*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1223.)

As a result, defendants have not shown it is reasonably likely they *in fact* did not receive a fair trial.

## IV. THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON ACCOMPLICE TESTIMONY WAS HARMLESS[*]

As outlined above, Turner and Grayson testified at trial. On appeal, defendants allege, and the Attorney General agrees, that there was enough evidence Turner and Grayson were accomplices so as to trigger the duty to instruct the jury on accomplice testimony. (See, e.g., CALCRIM 334.) The Attorney General argues that though the instruction omission was erroneous, it was not prejudicial. We agree that the omission of instruction on accomplice testimony was not prejudicial.

When there is evidence a witness was an accomplice to a charged crime, the court "must instruct the jury on accomplice testimony. [Citation.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1114.) Instructions like CALCRIM 334 inform the jury they should only use the testimony of someone they conclude is an accomplice if it has been corroborated by other evidence. (CALCRIM No. 334.) It also tells the jury to view "with caution" testimony from an accomplice implicating the defendant. (*Ibid*.)

---

**59** The court told juror 2290579 that whatever she read in the paper "doesn't mean anything because what counts is what happens in this courtroom, what evidence and testimony that you hear." The court told juror 2294657 that she is "not allowed to consider any of that, [i.e., media accounts]" and "would only be able to consider evidence and the testimony that you receive in court." The court instructed juror 2301135 not to consider what he or she had heard about the case. The court's comments on the issue to juror 2201455 were largely in the form of questions, but the juror said he understood that the law required him to only consider information received in the courtroom.

**\*** See footnote, *ante*, page 1.

There are at least two ways omission of the accomplice instructions can be deemed harmless. First, the error is harmless "where there are other circumstances that would cause the jury to distrust the accomplice testimony." (*People v. Mackey* (2015) 233 Cal.App.4th 32, 125; see also *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 304; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 26; see, e.g., *People v. Lewis* (2001) 26 Cal.4th 334, 371; *People v. Miranda* (1987) 44 Cal.3d 57, 101, abrogated on another point in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.) Second, the error may be rendered harmless by "sufficient corroborating evidence of the accomplice testimony …." (*People v. Gonzales and Soliz*, *supra*, at pp. 303–304.) We find the omission of accomplice testimony instructions harmless on the first basis, and do not reach the second. (*Id.* at p. 304 [harmless error analyses are "alternative" to one another].)

Here, the jurors were instructed they could consider *anything* that "reasonably tends to prove or disprove the truth or accuracy of that testimony," including: (1) whether the testimony was "influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided[]"; (2) whether "the witness ma[de] a statement in the past that is … inconsistent with his or her testimony[]"; (3) whether the witness had committed misconduct; and (4) whether the witness was promised immunity. The jurors were also told that if they decide a witness deliberately lied about something significant, they "should consider not believing anything the witness says." Or, the jurors could accept the part believed to be true and ignore the rest.

As we explain below, the record shows there were "other circumstances that would cause the jury to distrust the accomplice testimony[]" (*People v. Mackey*, *supra*, 233 Cal.App.4th at p. 125) and apply the witness credibility instructions they did receive. Consequently, the omission of the accomplice instructions was harmless. (*Ibid.*; see also

60.

*People v. Gonzales and Soliz, supra*, 52 Cal.4th at p. 304; *People v. Miranda*, *supra*, 44 Cal.3d at p. 101.)

### A. *The Failure to Give the Accomplice Instructions was Harmless with Respect to Turner*

The reason jurors are instructed to "view accomplice testimony with caution is 'because he or she "usually testif[ies] in the hope of favor or the expectation of immunity" ' [citation] …." (*People v. Hinton* (2006) 37 Cal.4th 839, 881.) Here, Turner actually testified at trial that she had *already* received blanket immunity from criminal prosecution.[60] As a result, under *Hinton*, the failure to instruct the jury with the full complement of accomplice instructions was harmless with respect to Turner. (*Id.* at pp. 880–881.)

### B. *The Failure to Give Accomplice Instructions was Harmless with Respect to Grayson*

The failure to give accomplice instructions was harmless as to Grayson as well, because there were "other circumstances that would cause the jury to distrust" her testimony. (*People v. Mackey*, *supra*, 233 Cal.App.4th at p. 125) Specifically, Grayson's testimony at trial conflicted with statements made to law enforcement. Consequently, the jury would have used the general witness credibility instructions in evaluating Grayson's testimony, and the failure to explicitly instruct the jury to consider Grayson's testimony with caution was harmless.[61] (See *People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 304.)

---

[60] Moreover, the jury was explicitly told it could consider whether a witness had been provided immunity in evaluating their testimony.

[61] For similar reasons, the failure to instruct on the corroboration requirement was harmless with respect to Grayson because "the jury had before it ample information suggesting [her] testimony may not have been completely trustworthy…." (*People v. Miranda*, *supra*, 44 Cal.3d at p. 101.)

## V.   THE TRIAL COURT'S MOTIVE INSTRUCTIONS WERE NOT ERRONEOUS*

Defendants also raise a challenge to the court's instructions on motive.  (See CALCRIM No. 370.)

The court instructed the jury with CALCRIM No. 370 as follows:

> "*The People are not required to prove that the defendant had a motive to commit any of the crimes charged.*  In reaching your verdict you may, however, consider whether the defendant had a motive.  Having a motive may be a factor tending to show that the defendant is guilty.  [¶] Not having a motive may be a factor tending to show the defendant is not guilty."  (Italics added.)

The court later instructed the jury with the elements of the gang enhancement set forth in section 186.22, subdivision (b)(1) as follows:

> "If you find the defendant guilty of the crimes charged in Counts 1 through 20, 22 through 24, 27, or of attempting to commit those crimes or the lesser offenses, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant committed the crime for the benefit of or in association with a criminal street gang.

> "You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.

> "*To prove this allegation, the People must prove that the defendant committed the crime for the benefit or in association with a criminal street gang.*

> "*And, two, the defendant intended to assist, further, or promote criminal conduct by gang members.*"  (Italics added.)

Defendants also argue it was error for the court to instruct the jury that the People did not have to prove motive, because section 186.22, subdivision (b)(1) does require the prosecution to prove motive.

Defendants acknowledge that we rejected this argument in *People v. Fuentes* (2009) 171 Cal.App.4th 1133 (*Fuentes*), but ask that we reconsider that holding.  We decline to do so because its reasoning is valid.

---

\* See footnote, *ante*, page 1.

62.

In *Fuentes*, we noted that the "intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent[,]" such as intent to kill. (*Fuentes*, *supra*, 171 Cal.App.4th at p. 1139.)  Consequently, when the motive instruction (CALCRIM No. 370) and gang allegation instruction (CALCRIM No. 1401) are considered together, they inform the jury that the prosecution must prove the defendants "intended to further gang activity but need not show what motivated [their] wish to do so…."  (*Fuentes*, *supra*, 171 Cal.App.4th at pp. 1139–1140.)  As a result, there was no error.[62]

Defendants also try to distinguish *Fuentes*.  They note that in the present case, the jury was instructed pursuant to CALCRIM No. 1403 that they may consider evidence of gang activity to decide whether "the defendant had a motive to commit the crimes charged."[63]  (CALCRIM 1403.)  We see no relevance in this distinction.  The instruction that a jury may consider whether "defendant had a motive to commit the crimes charged" (*ibid.*) is plainly harmonious with CALCRIM No. 370, which tells jurors they may "consider whether the defendant had a motive" (CALCRIM 370).

## VI.   SUFFICIENT EVIDENCE SUPPORTED THE GANG-RELATED ENHANCEMENTS[*]

Defendants next argue that there is insufficient evidence to support the gang (§ 186.22, subds.(b)(1), (b)(1)(C), (b)(1)(B)) and gang firearm enhancements (§ 12022.53, subds. (b), (e)).

---

[62] Because we find no error, we also reject defendants' claim that the motive instruction violated their federal right to due process.

[63] In his opening brief, defendant Joseph requests that we take judicial notice of the clerk's transcript in *Fuentes* to confirm that CALCRIM 1403 was not given.  Because the request is made in support of an argument we find irrelevant, we deny the request.

[*] See footnote, *ante*, page 1.

Section 186.22, subdivision (b)(1) has "only two elements:  (1) that the defendant committed a felony for the benefit of, at the direction of, *or* in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members.  [Citation.]"  (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613, italics in original; § 186.22, subd. (b)(1).)  Defendants argue there was insufficient evidence as to both elements.  We address each in turn.

A.  *Substantial Evidence Supports the First Element of the Gang Enhancement*

The gang enhancement's first element can be satisfied in one of three ways: by showing the defendant committed a felony (1) for the benefit of a gang, (2) at the direction of a gang, or (3) in association with a gang.  In this case, there was very substantial evidence the defendants' crimes were committed "in association with" a criminal street gang.

Defendants do not argue that there was insufficient evidence they were members of a gang.  Nor do they contend there was insufficient evidence they committed the underlying crimes together.  And once the jury concluded defendants committed the charged crimes with fellow gang members, they could reasonably infer the type of "association" that satisfies the gang enhancement.  (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)

Defendants' remaining contentions do not compel a different result.  For example, Bell notes that the underlying crimes were committed far outside the gang's turf, and that there was no evidence the proceeds from the robbery were used by the gang at-large.  These points go to the issue of whether the underlying crimes were committed "for the benefit of" the gang.  But, as we noted above, showing a crime was committed "for the benefit of" the gang is just one of three ways to meet the first element of the gang enhancement statute.  Since the prosecution need only prove one of the three, any claim of weakness in the evidence that the crimes were committed "for the benefit of" the gang

64.

is not dispositive in light of the substantial evidence the crimes were committed "in association with" a gang.

### B. *Substantial Evidence Supports the Second Element of the Gang Enhancement*

The second element of the gang enhancement is the intent requirement. (§ 186.22, subd.(b)(1).) To violate the gang enhancement statute, the defendant must commit a felony "with the specific intent to promote, further or assist in any criminal conduct by gang members…." (§ 186.22, subd. (b)(1).) Defendants contend there was insufficient evidence to establish this element. We disagree.

" '[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1171.) Defendants do not raise a substantial evidence challenge to the jury's conclusions that they each intended to and did commit the underlying felonies with known members of a gang. And the evidence tending to show defendants intended to and did commit the underlying felonies with other gang members, in turn, is sufficient to raise an inference that they each " 'had the specific intent to … assist criminal conduct by those gang members.' [Citation.]" (*Ibid.*)

Defendants' remaining contentions do not alter this conclusion. For example, defendant Lewis points out there were no gang slogans, signs or colors shown during the robbery. Again, these observations may be claimed to undermine the notion that the underlying crimes were done to "benefit" a gang by enhancing its reputation. But since substantial evidence supported the enhancement's elements in other ways, these observations are not dispositive.

## VII. SUBSTANTIAL EVIDENCE SUPPORTED THE PERSONAL FIREARM USE ENHANCEMENT FINDINGS AGAINST WILLIAMS[*]

Williams argues that there was insufficient evidence to support the personal firearm use enhancements (§ 12022.5, subd. (a)) on counts 5–7, 10–11. He argues that he "did nothing with a pistol that completed any essential element of an assault with a semiautomatic firearm." In arguing this point, Williams largely focuses on the seconds surrounding the alleged assaults themselves. But our analysis in determining whether he "used" the gun in the commission of the assaults requires a broader view. (See *People v. Masbruch* (1996) 13 Cal.4th 1001, 1011 (*Masbruch*).) The functional test for "use" under section 12022.5, subdivision (a) is whether the defendant took "some *action* with the gun *in furtherance of the commission* of the crime[.]" (*People v. Granado* (1996) 49 Cal.App.4th 317, 324, fn. 7, italics in original.)

The surveillance video showed the assailant alleged to be Williams moved from the car to the casino door holding the gun in a manner visible to the surveillance recording. The jury could reasonably conclude that by carrying the gun visibly in his hand, Williams "used" the gun to obtain unchallenged access to the building where all the other assaults occurred. If so, Williams satisfied the enhancement's requirements by taking "some action with the gun" (i.e., holding it visibly), which furthered the commission of the later assaults by facilitating unchallenged access to the building where the assaults occurred.

We assume that the jury indulged such an inference. Consequently, the enhancement must stand even if Williams did not " 'continually display the weapon during the course of later crimes.' [Citation.]"[64] (*Masbruch*, *supra*, 13 Cal.4th at

---

[*] See footnote, *ante*, page 1.

[64] While the prosecution need not necessarily show that Williams repeatedly displayed the weapon while committing crimes occurring after the initial "use" of the weapon, it does not hurt its case that there *was* plenty of evidence showing precisely that. In several portions of the surveillance video, the assailant alleged to be Williams is

p. 1011.) Firearm "use" need not be strictly contemporaneous with the base felony. (*People v. Wilson* (2008) 44 Cal.4th 758, 807.)

The Supreme Court's decision in *Masbruch*, *supra*, 13 Cal.4th 1001, is instructive on this point. In *Masbruch*, the defendant entered the victim's living room and pointed a gun at her face. (*Id.* at p. 1004.) The defendant took her checkbook. Assuming the gun was still pointed at her, the victim complied when the defendant ordered her to lie face down in the kitchen. The defendant tied her hands and feet together. The victim's mother came downstairs. The defendant sat the mother down and tied her hands and feet. He told both women he wanted jewelry and money. The women directed the defendant to several areas in the house. The defendant would go to the area, then return to the kitchen, and the women would then identify another location. The victim could only "really see" the defendant's feet during this time. After a period of quiet, the defendant shocked the victim with an instrument that was apparently created by splicing several electrical cords together. The defendant untied the victim, went through her pockets, and then proceeded to rape and sodomize her. The defendant eventually left. The entire ordeal lasted over an hour, and the victim never saw the gun after the defendant had first pointed it at her.

The *Masbruch* defendant argued that he only displayed the firearm once at the outset of his criminal activity, approximately one hour before he raped and sodomized the victim. (*Masbruch*, *supra*, 13 Cal.4th at p. 1006.) Consequently, he contended there was

---

clearly seen holding the gun while Chester or Ahrens are on screen, and shortly after Gomez leaves the screenshot. Even without testimony, the jury was free to conclude those victims personally perceived the gun based on that evidence. Other portions of the surveillance video show the assailant alleged to be Williams walking through the casino with the gun clearly visible.

insufficient evidence to support a personal firearm use enhancement as to the rape and sodomy charges.[65] (*Ibid*.)

The Supreme Court rejected the defendant's contention. The high court held:

"In considering whether a gun use occurred, the jury may consider a 'video' of the entire encounter; it is not limited to a 'snapshot' of the moments immediately preceding a sex offense. Thus, a jury could reasonably conclude that although defendant's presence with the victims was sporadic, the control and fear created by his initial firearm display continued throughout the encounter." (*Masbruch*, *supra*, 13 Cal.4th at p. 1011.)

In the present case, the jury could – quite literally – consider the "video" of the entire encounter at the casino. The surveillance video shows the assailant alleged to be Williams exiting the red vehicle outside the casino and proceeding towards the door with a gun in his hand. Before entering the casino, he is not physically challenged by the men standing outside. The jury was free to conclude that this was due, in part, to his carrying a firearm in plain view. This fact alone demonstrates how Williams' use of the gun was connected with each felony he committed inside the casino.

Even if that were not enough, the video also shows the assailant alleged to be Williams entering a large card room of the casino with the gun clearly visible in his hand. He later points the gun at the casino's floor manager, Becky Tam, and appears to point the gun at others. The video shows the assailant proceed to walk around the casino floor, with the gun clearly visible in his hand. Thus, this is not a situation where the assailant kept the weapon holstered, never threatens any victim with it, and never "make[s] use of" it. (E.g., *People v. Elliott* (1977) 70 Cal.App.3d 984, 988.)

We find that sufficient evidence supports these firearm enhancements.

---

[65] The firearm enhancement in *Masbruch* was imposed under section 12022.3, subdivision (a), while Williams challenges the firearm enhancements imposed on him pursuant to section 12022.5, subdivision (a). There is no material difference between 12022.3, subdivision (a) and 12022.5, subdivision (a), with respect to the issues presented here. (See *Masbruch*, *supra*, 13 Cal.4th at p. 1007; *People v. Frausto* (2009) 180 Cal.App.4th 890, 899–900.)

VIII.  ASSAULT WITH A SEMIAUTOMATIC FIREARM IS NOT A LESSER
INCLUDED OFFENSE OF ASSAULT WITH AN ASSAULT WEAPON
UNDER THE ELEMENTS TEST*

Defendants argue that their convictions for assault with a semi-automatic firearm
(§ 245, subd. (b) – counts 5–6, 9–10) must be reversed because that they are lesser
included offenses of his convictions for assault with an assault weapon (§ 245,
subd. (a)(3) – counts 13–14, 16–17.)

"[M]ultiple convictions may *not* be based on necessarily included offenses.
[Citations.]" (*People v. Pearson* (1986) 42 Cal.3d 351, 355, italics in original.)  In this
context, we use the "elements test" to determine whether one offense is necessarily
included in another.  (*People v. Reed* (2006) 38 Cal.4th 1224, 1231.)[66]  That test provides
that "if the statutory elements of the greater offense include all of the statutory elements
of the lesser offense, the latter is necessarily included in the former…." (*Id.* at p. 1227.)
Here, defendants contend assault with a semiautomatic firearm is a necessarily included
offense of assault with an assault weapon and therefore they could not be convicted of
both.  We disagree with the first premise, and conclude assault with a semiautomatic
firearm is not a necessarily included offense of assault with an assault weapon.

Assault with a semiautomatic firearm is defined as occurring when a person
"commits an assault upon the person of another with a semiautomatic firearm…."
(§ 245, subd. (b).)[67]  Under the elements test, we must determine whether all of these

---

* See footnote, *ante*, page 1.

[66] Another test for determining whether one offense is necessarily included in
another is called the accusatory pleading test.  While that test is appropriate in other
contexts, it is not the appropriate test when deciding whether a defendant may be
convicted of multiple charged offenses.  (*People v. Reed*, *supra*, 38 Cal.4th at p. 1231.)

[67] A semiautomatic firearm is one that " 'fires once for each pull on the trigger and
reloads automatically, but requires the shooter to release the trigger lever before another
shot can be fired.' [Citation.]" (*In re Jorge M.* (2000) 23 Cal.4th 866, 874, fn. 4.)

elements are also completely included in the crime of assault with an assault weapon. It is important to note that we perform this analysis "*in the abstract*" without consideration of the evidence at trial. (*People v. Steele* (2000) 83 Cal.App.4th 212, 218, italics in original.)

Assault with an assault weapon is defined as occurring when a person "commits an assault upon the person of another with … an assault weapon, as defined in Section 30510 or 30515…." (§ 245, subd. (a)(3).) Sections 30510 and 30515 set forth various firearms and categories of firearms that qualify as assault weapons. All of those firearms and categories necessarily include only semiautomatic weapons, with one exception: subdivision (a)(8) of section 30515. That provision includes within the definition of assault weapon: "[a]ny shotgun with a revolving cylinder."[68] (§ 30515, subd. (a)(8).) Therefore, according the statutory elements of each crime considered in the abstract, assault with an assault weapon can theoretically be committed without also committing assault with a semiautomatic weapon. Specifically, someone could assault another person with a nonsemiautomatic shotgun with a revolving cylinder and thereby commit assault with an assault weapon but not assault with a semiautomatic weapon. Consequently, neither is a lesser included offense of the other.

Defendants were not improperly convicted of greater and lesser included offenses.

---

[68] Unlike the other categories, the one identified in subdivision (a)(8) is not limited to semiautomatics. (Compare § 30515, subd. (a)(8) ["*Any* shotgun with a revolving cylinder" (italics added)] with §§ 30510 [certain "designated semiautomatic firearms"], 30515, subds.(a)(1)–(3) [certain "semiautomatic, centerfire rifle[s]…"], (a)(4)–(5) [certain "semiautomatic pistol[s]"], (a)(6)–(7) [certain "semiautomatic shotgun[s]"].)

IX. SUFFICIENT EVIDENCE SUPPORTED BELL'S CONVICTION FOR POSSESSING A FIREARM AS A FELON\*

Bell contends his conviction for possessing a firearm as a felon (§ 12021, subd.(a)(1) – count 18) on or about September 13, 2007, was not supported by substantial evidence. We disagree.

"The act proscribed by section 12021 is possession of a firearm by a felon. [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.) Bell stipulated he had suffered a prior felony conviction, so the central issue is whether there was sufficient evidence he "possessed" a firearm on or about September 13, 2007.

"Possession may be physical or constructive, and more than one person may possess the same contraband. [Citation.] Possession may be imputed when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another. [Citation.]" (*People v. Miranda*, *supra*, 192 Cal.App.4th at p. 410.)

On substantial evidence review, " '[w]e must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" [Citation.] "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Here, we conclude that the jury might have logically concluded, based on the circumstantial evidence, that Bell possessed the SKS rifle on or about September 13, 2007. We therefore must uphold the conviction. (See *ibid*.)

---

\* See footnote, *ante*, page 1.

71.

There was substantial evidence of the following: defendants Joseph, Lewis and Williams carried guns during the casino robbery on September 13, 2007, including an SKS rifle. Hours later, Bell and at least some of the other defendants went to Turner's home, at which time Bell gave Turner a bag of incriminating evidence and told her to "get rid" of it. Sometime between one to five weeks later, Turner found an SKS rifle in a garage closet. Turner believed the SKS rifle had not been there before Bell had arrived at her home in September 2007 and that Bell had placed the gun in the closet. From the evidence supporting these inferences, the jury could have reasonably concluded Bell possessed the SKS rifle on or about September 13, 2007.

## X. SUFFICIENT EVIDENCE SUPPORTED THE PRINCIPAL FIREARM USE ENHANCEMENT ON COUNT 2 AS TO WILLIAMS[*]

Williams argues there was insufficient evidence to prove a principal personally used a firearm in the robbery of Stephen Mongeon (Mongeon). The Attorney General counters that the surveillance video constitutes substantial evidence that Williams himself "used" a firearm in the robbery of Mongeon, and we agree.

Mongeon was working in the cash cage when defendants barged in to the casino. The surveillance video shows Mongeon ducked down at his register near the time an offscreen voice is heard saying, "[E]verybody get down." Several seconds later, the assailant alleged to be Bell jumps through the cash cage window of Belinda Soto, which is adjacent to Mongeon's window. Approximately one-half of a minute later, the assailant alleged to be Williams is seen holding his pistol in his hand outside Soto's cash cage window. Shortly thereafter, the assailants alleged to be Bell and Williams open two registers at Mongeon's window. Bell removes cash from his register and places it in the bag as Williams stays next to him. Williams leaves the cash cage holding the gun in his

---

[*] See footnote, *ante*, page 1.

72.

right hand. Over a minute after Bell and Williams leave the cash cage, Mongeon finally stands up, near his registers.

From this evidence, the jury could have reasonably concluded that Williams was holding and displaying his gun throughout the time Bell was removing cash from Mongeon's register. Given where Mongeon ducked down and later emerged, the jury could have also reasonably concluded that he perceived the gun Williams was holding. Consequently, we conclude there was substantial evidence to support the firearm enhancement.[69]

XI. WE ACCEPT THE ATTORNEY GENERAL'S CONCESSION THAT DEFENDANTS' CONVICTION FOR CONSPIRACY ON COUNT 22 MUST BE REVERSED FOR INSUFFICIENT EVIDENCE[*]

Defendants were convicted of two conspiracies in connection with actions taken in 2008. In count 22, the defendants were charged with and convicted of conspiracy to commit assault with a semiautomatic weapon. In count 23, the defendants were charged with and convicted of conspiracy to commit robbery. On appeal, defendants contend there is only evidence of one conspiracy and the conviction on count 22 should be reversed. The Attorney General concedes this issue and agrees the conviction for conspiracy to commit assault with a semiautomatic weapon must be reversed for insufficient evidence.

We accept the Attorney General's concession because the evidence shows the criminal acts defendants agreed to commit (i.e., robbery, assault with a semiautomatic weapon), were " ' "tied together as stages in the formation of a larger all-inclusive

---

[69] Bell, Lewis and Joseph filed joinders to Williams's argument on this point. They offer no material additions to Williams's contention. And since defendants violated section 186.22, subd. (b) and were principles in the robbery, the firearm enhancement applies if *any* of them used a firearm. (§ 12022.53, subd. (e)(1).) Based on our analysis above, we conclude that there was sufficient evidence Williams used a firearm.

[*] See footnote, *ante*, page 1.

combination, all directed to achieving a single unlawful end or result." ' [Citation.]" (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1672.) As a result, we will reverse the conviction for conspiracy to commit assault with a semiautomatic weapon (count 22), as to all defendants.[70]

XII. THE TRIAL COURT ERRED IN IMPOSING BOTH GANG AND FIREARM ENHANCEMENTS AS TO JOSEPH, WILLIAMS AND LEWIS ON COUNTS 5–7, AND 9–10[*]

Joseph, Williams and Lewis contend, and the Attorney General concedes, that the trial court erred in imposing personal firearm use enhancements (§ 12022.5, subd. (a)) *and* gang enhancements (§ 186.22, subd. (b)(1)(C)) as to counts 5–7 and 9–10.

We accept the concession because the trial court improperly imposed two enhancements for "using … a firearm in the commission of a single offense." (§ 1170.1, subd. (f); see also *People v. Rodriguez* (2009) 47 Cal.4th 501.) Accordingly, the matter must be remanded for sentencing so the trial court can "restructure its sentencing choices .…" (*Id.* at p. 509.)[71] Given our remand for a jury trial on defendants' jeopardy

---

[70] This conclusion moots defendants' claim the court's conspiracy instructions were erroneous.

[*] See footnote, *ante*, page 1.

[71] The Attorney General submits that Bell's, Williams's, and Joseph's abstracts of judgment must be amended to reflect stayed sentence enhancements that were orally pronounced but omitted from the abstracts. Since defendants are being resentenced on remand (if the jury returns a double jeopardy verdict for the People), we need not order any corrections, but will direct the trial court to list all sentence enhancements on the new abstracts of judgment, even those that are stayed. The Attorney General also contends that the trial court erred by failing to either strike or impose the following gang enhancements: Section 186.22, subdivision (b)(1) enhancement on count 27 as to Bell; section 186.22, subdivision (b)(1)(B) enhancements on counts 13, 14 and 17 as to Williams; section 186.22, subdivision (b) enhancement on count 27 as to Lewis. We will direct the court to either strike or impose all gang enhancements at resentencing in accordance with applicable law. (See § 186.22, subd. (g).)

pleas, this resentencing would only occur if the jury returns a verdict in favor of the People.

## XIII.   VARIOUS ERRORS SHOULD BE AVOIDED AT RESENTENCING[*]

### A.   *The Trial Court Erred by Failing to Strike or Impose Certain Gang Enhancements*

The Attorney General contends that the trial court erred by failing to either strike or impose the following gang enhancements:  section 186.22, subdivision (b)(1) enhancement on count 27 as to Bell[72]; section 186.22, subdivision (b)(1)(B) enhancements on counts 13, 14 and 17 as to Williams[73]; section 186.22, subdivision (b) enhancement on count 27 as to Lewis.[74]

Given that defendants will be resentenced if they do not prevail at the jeopardy trial, we will simply direct the court to ensure that if resentencing occurs, the abstracts of judgment accurately reflect all imposed enhancements, whether stayed or not.

### B.   *Bell's Abstract of Judgment Identifies the Wrong Subdivision in Setting Forth his Enhancements on Counts 7 and 11*

Bell contends, and the Attorney General concedes, that his abstract of judgment incorrectly indicated that his sentences in counts 7 and 11 were enhanced by one year eight months pursuant to "section 186.22 (b)(1)(C)" rather than "section 186.22 (b)(1)(B)."  However, since we are conditionally reversing the judgment, we will simply direct the trial court to ensure that any new abstracts of judgment identify the correct Penal Code provisions.

---

[*] See footnote, *ante*, page 1.

[72] The court did impose and stay (§ 654) the gang enhancement as to Bell on count 27.  However, the abstract of judgment does not reflect this.

[73] The court did impose and stay (§ 654) gang enhancements as to Williams on counts 13, 14, and 17.  The abstract of judgment, however, failed to reflect this.

[74] The abstract of judgment does not reflect imposition of the gang enhancement as to Lewis on count 27.

*C. The Trial Court Erroneously Failed to Impose and Stay a Firearm Enhancement on Count 21 as to Defendant Lewis*

The Attorney General also notes the court failed to impose and stay the section 12022.5, subdivision (a) firearm enhancement on count 21 as to defendant Lewis. Lewis concedes this enhancement should be imposed and stayed on remand. We agree the court has no discretion under section 1385 to strike that enhancement. If the enhancement is reinstated after the jeopardy trial, the trial court must impose and stay it. (See *People v. Herrera* (1998) 67 Cal.App.4th 987, 988–989.)

*D. The Attorney General Alleges Trial Court Failed to Double Certain Sentences as to Bell and Lewis*

Finally, the Attorney General claims the trial court improperly failed to double the punishments for some of Bell's and Lewis's convictions. Specifically, the Attorney General contends the court should have doubled counts 1–4, 7, 11, 13 and 22 as to Bell; and counts 1–4 and 22 as to Lewis. However, it appears the trial court actually did double the terms, but did not explain that calculation in its oral pronouncement and abstracts of judgment.

For example, on counts 1–4, Lewis and Bell were convicted of second degree robbery. The sentencing triad for that offense is "two, three or five years." (§ 213, subd. (a)(2).) Since the robbery terms were subordinate to count 12, the court was to calculate one-third of the middle term (§ 1170.1, subd. (a)) and then double it. (See generally *People v. Nguyen* (1999) 21 Cal.4th 197.) This calculation yields a term of two years, which is what the court imposed.

## DISPOSITION

The convictions of defendants Bell, Joseph, Williams and Lewis for conspiracy to commit assault with a semiautomatic weapon (count 22) are reversed and retrial of that charge is prohibited.

The judgment and all defendants' other convictions and enhancements are conditionally reversed.

On remand, the prosecution or trial court may move to strike defendant's pleas of once in jeopardy. If such a motion is made, defendants shall be afforded an opportunity to present evidence. Thereafter, if the court concludes that defendants have raised no issue of fact (i.e., the facts concerning the pleas are undisputed and there is only one reasonable inference to be drawn from those undisputed facts), the court may strike defendants' pleas of once in jeopardy and reinstate the convictions, except the conviction on count 22. If, however, the court concludes there is any issue of fact presented with respect to defendants' jeopardy pleas (or if no motion to strike is made by the prosecution or the trial court), a jury trial must be held on defendants' pleas of once in jeopardy. (See Discussion, § I.E., *ante*.) At such a trial, defendants would bear the burden of proof. If the People prevail at trial, the court shall reinstate their convictions, except the conspiracy conviction on count 22. If the defendants prevail at trial, the court shall not reinstate their convictions.

If any convictions are reinstated after the jury trial on defendants' pleas of once in jeopardy, the trial court shall resentence defendants in a manner "that does not violate section 1170.1's subdivision (f)[]" (*People v. Rodriguez*, *supra*, 47 Cal.4th at p. 509) and thereafter have accurate abstracts of judgment prepared and transmitted to the appropriate parties and entities. At any such resentencing, the trial court may not impose both the personal firearm use enhancements (§ 12022.5, subd. (a)) and the violent felony gang enhancements (§ 186.22, subd. (b)(1)(C)) on counts 5, 6, 7, 9, 10, and 11 as to Williams, Joseph and Lewis. And if the conviction on count 21 is reinstated as to defendant Lewis,

77.

the trial court is directed to impose and stay the section 12022.5, subdivision (a) firearm enhancement.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
SMITH, J.

78.